**SEDALIA MERCANTILE BANK AND TRUST COMPANY, Respondent,**

v.

**LOGES FARMS, INC., Robert Loges, Carol Loges, Stanley Loges, Janet Loges, Larry Loges and Judith Loges, Appellants,**

v.

**SEDALIA MERCANTILE BANK AND TRUST COMPANY and Mercantile Bancorporation, Inc., Respondents.**

**No. WD 38310.**

Missouri Court of Appeals, Western District.

Sept. 1, 1987.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 27, 1987.

Application to Transfer Denied Dec. 15, 1987.

Theodore C. Beckett, Don R. Lolli, Emmett J. McMahan, Beckett and Steinkap, Kansas City, for appellants.

W. Stanley Walch, Dan H. Ball, Roman P. Wuller, Thompson & Mitchell, St. Louis, for respondent.

Before CLARK, C.J., and TURNAGE and NUGENT, JJ.

CLARK, Chief Judge.

This is an action in replevin, coupled with a claim for damages, brought by respondent bank. The debtors-appellants filed counterclaims for the unreasonable disposition of the property seized. The issues, broadly stated, are whether the bank pleaded, proved by admissible evidence and properly submitted to the jury causes of action in replevin and in damages upon which the relief given could have been awarded, and whether the court correctly directed a verdict for the bank on certain of the counterclaims.

## THE PARTIES AND THE CONTROVERSY

Sedalia Mercantile Bank and Trust Company had, for many years, been a major source of financing for a farming enterprise conducted by the corporate defendant, Loges Farms, Inc. The stockholders in that company are defendants, Robert, Stanley and Larry Loges who, together with their wives, Carol, Janet and Judith Loges, also defendants, were guarantors of the loans made by the bank to the Loges corporation. By 1981, the accumulated debt owed to the bank exceeded $500,000 and the financial health of the farming business was in decline.

In the summer of 1981, the bank participated in restructuring the Loges' debts with the aid of financing provided through the Farmers Home Administration. The obligation owed the bank was reduced, the FHA acquired a mortgage on Loges' real estate and the bank debt was restated and collateralized by security agreements conveying an interest in Loges' farm equipment, vehicles and livestock.[1]

---

1. Respondent had a prior security interest in the personal property of Loges Farms by reason of earlier security agreements. There is no issue in the case as to the validity of the bank's secured position or the identity of the collateral.

The major portion of the bank debt involved in this suit was represented by a previously executed promissory note for $200,000 dated June 9, 1980. Additional notes completing the catalog of Loges' debts after the restructuring in mid–1981 were two notes dated August 24, 1981, one for $50,000 and another for $9,000. A subsequent advance of $30,000 was evidenced by a note dated January 21, 1982. Personal guarantees were given with each note and security agreements were taken, all of which listed, in the main, the same farm equipment and livestock.

The notes all provided for monthly payments of interest, but the course of dealings between the parties was on the basis of semi-annual interest accruals. Each note bore a description of the due date in the following language: "On demand, and if no demand be made, then on the __ day of _____, 19__ * * *." Although the petition filed in this case alleged the notes to be payable on demand, the actual dates on which the notes became due depended on subsequent and collateral agreements for extensions.[2]

The $200,000 note was originally due June 9, 1981, at or about the time of the Loges debt restructuring. An extension agreement made August 24, 1981 revised that payment date and extended the note to January 21, 1982. Another agreement was made February 22, 1982 deferring payment and finally, by agreement dated February 28, 1983, the note was extended to July 21, 1983. Interest payments were made on the note in January and November, 1982.

The two notes for $50,000.00 and $9,000.00 dated August 24, 1981 were originally made payable January 21, 1982. This date coincided with the first extended payment date on the $200,000.00 note. They were not paid and on February 22, 1982, an agreement was made whereby Loges agreed to list its farmland for sale to improve its debt structure and, in return, the bank extended the payment dates on the notes for one year. Shortly prior to these agreements and perhaps as part of the same negotiations, the bank loaned Loges an additional $30,000 evidenced by a note dated January 21, 1982 payable in one year. Also, by agreement of modification dated February 28, 1983, the payment date on the $9,000 note of August 24, 1981 was extended to July 21, 1983.

The foregoing transactions may therefore be summarized as follows. On April 8, 1983, the date on which the payment demand was made and the replevin was instituted, the bank held four Loges' notes, those for $200,000 and $9,000 on which payment had been extended to July 21, 1983, and the notes for $50,000 and $30,000 which were past due as of either January 21, 1983 or February 22, 1983.[3]

On April 8, 1983, respondent notified appellants that all debts then owed to the bank were being declared due and immediate payment was demanded. The amount claimed and the written demand specified the sum of $304,321.23. Included were the principal sums of the four notes described above and accumulated interest. Appellants were unable to meet the demand, a circumstance apparently anticipated by respondent. A petition in replevin had already been prepared and was filed immediately after the payment demand had been made. Seizure of the Loges' livestock and farm equipment was then accomplished on that same day.

2. Respondent bank did not at trial and does not here contend the Loges' debts were demand notes. A demand note is one payable at sight or on presentation with no time for payment stated. Insertion of a payment date negates the demand character of an instrument. *Shaughnessy v. Mark Twain State Bank,* 715 S.W.2d 944, 951 (Mo.App.1986). *See also, Reese v. First Missouri Bank & Trust Co.,* 664 S.W.2d 530 (Mo.App.1983), for a discussion of the effect on a demand note of a payment extension agreement.

3. The uncertainty in the payment dates arises because the February 22, 1982 agreement states only that the notes are extended "until demand or 365 days." The agreement does not say whether the 365 days is measured from the previous due dates of the notes or from the date of the agreement. In either event, the $50,000.00 and $30,000.00 notes were past due on April 8, 1983, but the $200,000 and $9,000 notes were not.

An additional document entitled "Loan Agreement," was received in evidence and is relevant to the issues on appeal. That document was prepared on respondent's letterhead at the time of the Loges' debt restructuring in the summer of 1981. The agreement bears no date in the usual form, but does recite in the body of one paragraph, "This agreement will commence on August 20, 1981." Although the agreement purports to be between the bank and Loges Farms, Inc., the only provision for signature was by Loges and the agreement terms are essentially unilateral. The paragraph of the agreement most relevant to this appeal reads as follows:

> 2) All information furnished to the Bank by Customer concerning the collateral or finance condition of the Customer for the purpose of obtaining credit is or will be at the time furnished accurate and correct in all material respects and complete in so far as completeness may be necessary to give the Bank a true and accurate knowledge of the subject matter. Customer agrees to furnish the statements of collateral and financial condition on periodic basis as determined by the Bank.

The replevin count was submitted to the jury under instructions which conditioned a plaintiffs' verdict on the obligations of the notes and agreements described above and the defendants' default. The jury returned its verdict on that count in favor of the bank. The following discussion focuses on the issue of default. A prime question in the case is whether the full amount for which payment was demanded on April 8, 1983 was due warranting declaration of default and seizure of the collateral.

## THE LOAN AGREEMENT, PLAINTIFFS' THEORY OF DEFAULT AND RELATED JURY INSTRUCTIONS

In six points raised on this appeal, the Logeses contend the court erred in submitting the replevin count to the jury because there was no payment default entitling the bank to seize the collateral and the theory relied on by the bank to accelerate payment of the notes was not pleaded, was not supported by admissible evidence and was legally not sustainable. Some added facts are needed to place these issues in context.

The payment demand made on Loges April 8, 1983 was precipitated by discovery of information about other indebtedness owed by Loges and not disclosed by Loges to the bank earlier. In December of 1982, the bank's loan officer Baker was concerned about the state of Loges' financial affairs. He requested a statement of assets and liabilities. The statement was supplied but, as Baker later discovered, it did not include a debt to Emma Co-Op amounting to $236,239. Baker learned of this obligation in mid-March and that Emma Co-Op had filed suit March 14, 1983. Earlier, Baker had urged his superiors at the bank to call Loges' debts, but he had been overruled. The disclosure of the debt owed Emma Co-Op altered the situation and Baker was authorized to call the notes and proceed with the replevin.

The problem with the payment demand made of Loges on April 8, 1983 was that at least $209,000 plus accrued interest on that sum was not due until the following July under the extension and modification agreements executed February 28, 1983. To sustain the replevin, it was necessary for the bank to show an entitlement to accelerate the July due date and call the notes for payment prior to maturity. For this purpose, the bank relied on the Loan Agreement of August 1981 and the paragraph of that agreement quoted in the previous section of this opinion. It was the bank's theory that when Loges supplied the financial statement in December, 1982 and did not reveal the Emma Co-Op debt, it had breached the agreement " * * * to give the Bank a true and accurate statement," and such was cause under the Loan Agreement to call the notes for payment. This leads to the question of whether the terms of the Loan Agreement were applicable after the extension and modification agreements were made in February, 1983 and whether the Loan Agreement should have been admitted in evidence over objections.

It is appellant's contention that all understandings with the bank regarding the two notes in question were fully integrated in the February, 1983 extension and modification agreements and constituted the only controlling agreements on the subject. They argue that the Loan Agreement, which was not mentioned in the extension and modification agreements, was not available to the bank as a declaration of conditions applicable to the notes and was inadmissible as evidence in the case because it constituted proof of a prior agreement merged into the subsequent agreement.

The extension and modification agreements were, without doubt, complete statements of the parties' understandings in that they described the terms whereby the note payments were postponed and they incorporated the original notes and security agreements by reference. The extension and modification agreements did not, however, make any reference at all to the Loan Agreement nor did they purport to adopt any provisions of that agreement. The unique feature of the Loan Agreement, not found in the security agreements, was the undertaking by the debtor to furnish accurate and complete *future* financial data. Moreover, the extension agreements neither required nor purported to rely on any representation by the debtor of past or current financial condition. Thus, absent the Loan Agreement, there was no breach of any contractual undertaking by appellants in supplying the deficient financial statement of December, 1982.

With a few exceptions not applicable here, extrinsic evidence of a prior or contemporaneous agreement is not admissible to vary, add to or contradict terms of an unambiguous and complete written instrument, nor may such evidence be used to create ambiguity in an otherwise unambiguous contract. *Craig v. Jo B. Gardner,*

*Inc.,* 586 S.W.2d 316, 324 (Mo. banc 1979); *Centerre Bank of Kansas City v. Distributors, Inc.,* 705 S.W.2d 42, 51 (Mo.App. 1985); 4 S. Williston, *A Treatise on Contracts* § 631, at 949–60 (3d ed. 1961). If the parties have integrated their agreement into a single written memorial, all prior negotiations and agreements in regard to the same subject matter are excluded from consideration, whether they were oral or written. 4 Williston, *supra,* § 632, at 678; 3 A. Corbin, *Corbin on Contracts* § 576, at 383–84 (1960). An agreement is integrated if it is a complete statement of the bargain made between the parties. *Centerre Bank, supra,* 705 S.W.2d at 51.

■ The extension agreements of February 28, 1983, together with the notes and security agreements incorporated in the documents by reference, were complete, integrated and unambiguous statements of the understandings of the parties as of that date regarding the debts, the collateral and the terms of payment. Under the rule which precludes evidence of prior agreements once the parties have integrated their understandings into a single written document which is complete and unambiguous, it was error to admit the Loan Agreement in evidence to the extent that document added terms allegedly applicable to the $200,000 and $9,000 notes.[4] The error affected and tainted the theory and submission of the case because plaintiffs' verdict directing instruction made express reference to the Loan Agreement and relied on that agreement for the condition obligating Loges to furnish ongoing financial information and the Loges' breach of that condition.

■ Respondent argues that the Loan Agreement was admissible as a separate and distinct agreement even though it was collateral to, prior to and not incorporated in the subsequent agreements. The law does allow admission of evidence of such

---

4. The $50,000 and $30,000 notes were past due as of April 8, 1983, at least to the extent that there was no written agreement extending the payment dates. The Loan Agreement was therefore irrelevant as to those notes. In the alternative, the Loan Agreement was not admissible to enlarge or vary the terms of those notes and the accompanying security agreements because the Loan Agreement was a prior agreement in point of time to the dates of these notes. It is presumed to have been merged in the integrated agreements of the later notes and security agreements.

an agreement if it is not inherently in conflict with the writing itself. *Garden Park Homes Corp. v. Martin Marietta Corp.,* 507 S.W.2d 368, 373 (Mo.1974); *Bay v. Elmer,* 241 Mo.App. 389, 397, 237 S.W.2d 932, 936–37 (1951); *Mitchell v. Philippi,* 359 Mo. 754, 760–61, 223 S.W.2d 441, 444 (1949). The Loan Agreement here was not compatible with the extension agreements, notes and security agreements because the conditions of the Loan Agreement were far broader. The security agreements enumerated six events which could precipitate a default and the corresponding maturity of the notes. By contrast, the Loan Agreement contained thirteen paragraphs imposing numerous conditions and obligations on Loges and providing that if any "area" of the agreement were breached, all of Loges' notes held by the bank would become due. The Loan Agreement adds to the other agreements and it is therefore not admissible under the principle upon which respondent relies.

Respondent bank also argues, as an alternative position, that a default had occurred because the security agreements given in connection with the $200,000 and $9,000 notes required the borrower to submit accurate financial data. Apart from the fact that the jury submission was grounded explicitly on a breach of the condition in the Loan Agreement, the contention is not viable because the security agreement requirement was for financial information given "in connection with this agreement." The most recent of the security agreements was dated January 21, 1982, some eleven months before Loges gave the financial statement which did not reveal the Emma Co-Op debt. The extension of credit by respondent, as secured by the January, 1982 agreement, quite obviously was unrelated to any false information given nearly one year later. The argument would carry weight had the loan extension agreements included a condition

similar to that in the security agreements, but they did not.

▮ The conclusion that it was error to admit the Loan Agreement in evidence and to submit the cause of default based on breach of that agreement necessitates a reversal of the judgment as to the replevin count. It does appear, however, that respondent may have an alternate theory of recovery not dependent on the loan agreement. In the second amended petition, respondent alleged that by reason of the Emma Co-Op debt and suit, it deemed itself insecure under the security agreements and therefore proceeded with the payment demand and seizure of the collateral. In each of the security agreements, an event of default included "if Bank for any reason deem itself insecure."[5] That ground for recovery was abandoned at trial in that no evidence of such a determination was presented and no jury instruction under that theory was given. Respondent is entitled to a new trial for the purpose of proving its cause in replevin based on the theory of default not dependent on the Loan Agreement.

## RESPONDENT BANK'S CLAIM FOR DAMAGES

The third count of the bank's petition sought damages on the allegations and theory that the fraudulent misrepresentation in the Loges' financial statement rendered to the bank December 9, 1982 caused the bank to extend additional credit to the ultimate loss and damage of the bank. Appellants contend the damage claim was an ill-disguised attempt by the bank to recover the deficiency balance on the note debts remaining after sale of the collateral, a deficiency the bank was barred from collecting because the bank failed to give notice of the sale of collateral.

The furnishing of false or fraudulent financial information may or may not support a good faith entitlement to accelerate a debt, depending on the facts, and will usually present a jury question. Respondent here did not base its trial theory on this approach nor was any such issue presented to the jury.

---

5. The condition which allows a lender to accelerate the date for payment of a debt if he deems himself insecure is construed to mean that the right is available only if the creditor in good faith believes the prospect for payment is impaired, *Rigby Corp. v. Boatmen's Bank and Trust Co.,* 713 S.W.2d 517, 526–27 (Mo.App.1986).

The facts applicable to this point are as follows. When the bank caused the replevin order to be executed, it seized more than 1800 head of hogs from Loges. The date of seizure was April 8, 1983. On that same day, the bank sold some of the hogs to Ferguson Hog Market in Sedalia and on the following day, the remaining hogs were sold at the Johnson County Livestock Market in Warrensburg and at Marshall Livestock Auction in Marshall, Missouri. The total sales price received from the hogs was $98,455.52. The bank gave no notice to Loges of the time and place where the hogs would be sold and refused, on Loges' inquiry, to divulge that information.

■ The bank does not deny that it failed to comply with § 400.9–504(3), RSMo 1986.[6] It is therefore barred from seeking to recover any deficiency.[7] *See Boatmen's Bank of Nevada v. Dahmer*, 716 S.W.2d 876, 877 (Mo.App.1986); *Modern Auto Co. v. Bell*, 678 S.W.2d 443, 444 (Mo.App.1984); *Gateway Aviation, Inc. v. Cessna Aircraft Co.*, 577 S.W.2d 860, 863 (Mo.App.1978). The bank argues that it pleaded instead a cause of action in fraud and that the fact of its damages being the same in amount as the deficiency is not a material circumstance in determining whether its cause of action could be maintained.

Even assuming, for the purpose of ruling the point, that the statutory requirement for notice of sale could be evaded in this manner, a doubtful proposition (*see Chemical Sales Co. v. Diamond Chemical Co.*, 766 F.2d 364, 369 (8th Cir.1985)), the bank was not entitled to submission of its petition Count III because it failed to prove any damages sustained by reason of an alleged fraud or misrepresentation committed or made by Loges.

The petition alleged that as a result of Loges' false and misleading statements made December 9, 1982 and March 15, 1983 in which the Emma Co-Op debt and suit were either concealed or not disclosed, the bank was damaged by the extension of credit to Loges in the amount of $289,000 and interest. That amount was the sum of the four notes dated in 1980, 1981 and 1982. Of course, it is obvious that the loans when made were unrelated to the subsequent financial distress of Loges and the information supplied or withheld some two years later.

■ The bank argues in its brief that it presented direct evidence of damage suffered as a result of the misrepresentation. That assertion is without any support in the trial record. Loan officer Baker did testify that he believed the bank was injured by Loges' action in supplying false information but, as demonstrated by Baker's description of the loss, it was merely the deficiency balance.[8] In closing argument, the bank's attorney pointed to the evidence of the balance due after applying the proceeds from sale of the collateral and said, "[w]hat's left due is $98,022. And that's the amount of actual damages we're asking you, ladies and gentlemen, to award us in this case."

There was no attempt by the bank to prove that any action it took or refrained from taking on or after December 9, 1982 resulted in any loss, apart from the deficiency balance, no proof that the collateral declined in value between that date and the ultimate dates of the foreclosure sales and no proof or even any allegation that the collateral available for repossession on December 9, 1982 was not the same collateral seized April 8, 1983. In short, there was no proof of any monetary loss suffered by the bank "[a]s a direct and proximate result of Loges' false and misleading state-

6. Statutory references are to RSMo 1986.

7. Respondent disclaims any effort to recover a deficiency "as such." It therefore has not urged any argument supporting a proportional right to a deficiency based on the ratio of the value of the hogs sold without notice and the value of the farm machinery sold with judicial approval.

8. "Q. Do you believe that the Sedalia Mercantile Bank was injured by the actions of Loges Farms in supplying the false financial information that you discovered?
A. Absolutely.
Q. And why; to what extent; how?
A. Well, I think—well, if they had been truthful and worked with us, we would not have had a balance of deficiency. We would not—well that's my reasons."

ments." The bank was merely attempting to avoid the consequences of its failure to give notice of the foreclosure sale and to recover a deficiency balance by labeling the action as a claim for fraud. For want of proof of damages, the judgment for respondent on its petition Count III, Fraud, must be reversed.

## THE COUNTERCLAIMS BY LOGESES AS INDIVIDUALS

The original petition filed in this case named the Loges brothers and their wives as defendants in addition to the Loges corporation. The counts seeking relief against the individuals were based on their guarantees for payment by the corporation of the four notes in suit. It was based upon this initial petition that the replevin writ issued. The individuals responded by filing answers and counterclaims seeking damages for unlawful replevy, commercially unreasonable disposition of collateral and failure to give notice of the foreclosure sales.

■ At a later date, the bank filed an amended petition, some counts of which have been discussed above, and which was the pleading on which the plaintiffs' cause was tried. The amended petition discontinued the bank's action against the individuals who were not named as defendants. Some four months prior to trial, the bank moved to dismiss the counterclaims of the individual Logeses on the ground that they lacked standing to pursue the claims asserted. The court granted the motion. Counterclaims by the Loges corporation remained and were ultimately tried.

The Logeses argue that the court improperly dismissed counterclaims by the individuals because, as guarantors of the notes, they were debtors within the meaning of the term as used in the Uniform Commercial Code and therefore they had a cause of action for failure by the bank to give notice of the sale of the livestock as the code requires.

It is undisputed that § 400.9–504(3) required that the bank give notice to the debtors of the time and place of a public sale of the livestock or reasonable notice of any private sale, and that no notice of any kind was given to the Logeses, either as individuals or as representatives of the corporation. Under § 400.9–507(1), a debtor is entitled to recover from the secured party any loss caused by failure of the secured party to comply with the provisions of the applicable code section. A debtor for purposes of recovery against the secured party is one who owes payment or other performance of the obligation secured, whether or not he owns or has rights in the collateral. Section 400.9–105(1)(d). A guarantor is within this definition of debtor. *Clune Equipment Leasing Corp. v. Spangler*, 615 S.W.2d 106, 108 (Mo.App.1981); *See*, 6 UCC Case Dig. § 9150.4(5) (1984 rev. vol.).

Appellants are correct when they say that the individuals had a right to recover from the bank for any loss they sustained which was caused by a failure to comply with the notice provision. As we take the pleading, this was the sum and substance of the counterclaims upon which any cause of action was predicated.

■ The parties cite no Missouri case and independent research has disclosed none, which discusses what losses are includable in claims of this nature. J. White and R. Summers in *Handbook of the Law Under the Uniform Commercial Code* § 26–14, at 1126 (2d ed. 1980), state that "the logical benchmark by which to measure the debtor's loss is the difference between the amount actually realized on resale and the amount which would have been obtained had there been compliance with the Code's requirements." *See, also id.* n. 157. That is also the position taken by the Code's Permanent Editorial Board. *See*, Nickles, *Rethinking some U.C.C. Article 9 Problems—Subrogation; Equitable Liens; Actual Knowledge, Waiver of Security Interests; Secured Party Liability for Conversion under Part 5*, 34 Ark.L. Rev. 1, 152 n. 758 (1980–81). A secured creditor's failure to comply with § 400.9–504(3) at least results in waiver of any deficiency. *Gateway Aviation, supra*, 577 S.W.2d at 862–63; *Boatmen's Bank, supra*, 716 S.W.2d at 877. In *Ferrous Financial Services Co. v. Wagnon*, 70 Or.

App. 285, 294, 689 P.2d 974, 980 (1984), the court acknowledged the debtor status of guarantors, but held them not entitled to damages measured by the amount of surplus that would have been realized had the sale been commercially reasonable. The court reasoned that the surplus would have been the property of the primary debtor and therefore the guarantors could not show they had sustained any loss by reason of a commercially unreasonable sale. By analogy, guarantors are not concerned with a potential deficiency unless they are to be held liable for payment.

■ In this case, the Logeses individually had no property interest in the replevined assets which belonged to the corporation. Thus, their only stake in disposition of the collateral according to the code provisions was in the prospect of a deficiency should the sale be commercially unreasonable. That interest was at an end once the bank abandoned recourse against the individuals on their guarantees. Appellants contend, however, that they sought damages for lost profits and damage to personal credit and for emotional distress. If there were lost profits, they were sustained by the corporation, not by the individuals, except in a derivatory sense as potential dividends to shareholders. So, too, the damage to credit was suffered by the corporation. A guarantor of a defaulted corporate debt can scarcely claim any impairment to credit if the creditor accepts what can be paid by or secured from the corporation in satisfaction of the obligation.

Appellants stress that their counterclaims did not seek damages for any injury to the corporation, only the losses they suffered as individuals. In the main, the various counts of the counterclaims rested solely on a theory of damages grounded on § 400.9–504(3) for failure to give notice. As discussed above, once deficiency liability is precluded, the individuals can prove no monetary loss. Other claims, particularly those set out in Count III of the counterclaim, include emotional and physical distress, loss of reputation, humiliation and embarrassment. The factual underpinning for these claims is asserted by the pleading to include the callous loading of livestock in trucks in a manner which caused hogs to suffocate, be crushed and crippled, the indications of spite and ill will expressed by the bank's agents in carrying out the repossession and the unnecessary destruction of the farming business which the Logeses had conducted for many years.

Assuming the facts alleged to be true, as the record appears to confirm, the corporation suffered a monetary loss by the process of repossession in which the bank engaged. That claim was tried and a verdict was returned against respondent. The issue is whether the Logeses as individuals have a recognized cause of action against the bank for emotional distress and other intangible losses arising out of the same circumstances.

■ Apart from *Jones v. Rennie*, 690 S.W.2d 164 (Mo.App.1985), which they say is not applicable here, appellants cite no authority to support their claim that the facts alleged give rise to a justiciable cause of action in damages for non-monetary losses. Independent research has disclosed no reported case which approves or confirms the existence of a cause of action for which damages may be recovered in these circumstances, that is, for emotional distress without compensable, actual damages. It is appellants' obligation to cite appropriate and available precedent if they expect to prevail. *Thummel v. King*, 570 S.W.2d 679, 687 (Mo. banc 1978). If no authority is available, an explanation should be made for the absence of citations. Where, as here, appellants neither cite authority nor explain why authority is not available, the appellate court may be justified in considering the point abandoned. *Claspill v. City of Springfield*, 598 S.W.2d 183, 186 (Mo.App.1980). We conclude that to be the appropriate disposition here.

For the reasons stated, the ruling of the trial court which rejected the counterclaims by the Logeses as individuals is affirmed.

## THE CONSTITUTIONAL ISSUES OF THE REPLEVIN SEIZURE

In three points, appellants contend Missouri Supreme Court Rule 99 and the

bank's seizure under color of state law unconstitutionally deprived Loges of possession of its property without due process of law. The argument appears to be addressed to the absence of pre-seizure notice and hearing, an opportunity to post a re-delivery bond and the conduct of the bank in selling the livestock before any post-seizure hearing could be conducted.

The facts attendant upon execution of the writ of replevin have already been stated. The following additional details are pertinent. To secure the replevin order, the bank filed its petition and affidavit setting out the basis for its claim to immediate possession. The cause was presented ex parte to the court and the writ was signed by the circuit judge. The bank posted a bond in the sum of $700,000 which was approved by the judge. On April 11, 1983, Loges filed with the court a request for hearing on the right to possession of the property which had been seized by the bank on April 8. The hearing was held April 14, 1983. By that date, all the livestock had been sold, as described earlier. On August 11, 1983, the trial court entered an order overruling appellants' request for possession of the property pending trial on the merits,[9] and on January 31, 1984, an order for sale of the vehicles and farm machinery was made.

The initial claim by appellants is that Rule 99 is vague and ambiguous in that it does not prohibit the creditor from selling the property before a hearing. Secondly, Loges argues that the rule does not provide for judicial control over seizure and sale of the property. The final contention is that the bank deprived Loges of its property by unlawfully selling the livestock prior to any hearing and before Loges could post a re-delivery bond. On these accounts, Loges asserts that Rule 99 is unconstitutional in that it permits deprivation of property without due process of law.

The issues which Loges raises under these points have previously been ruled in other cases and may therefore be resolved by application of settled principles. Moreover, the contentions indicate a failure by Loges to distinguish between a seizure pursuant to statute and rule in a replevin suit and the rights of a creditor under an applicable security agreement.

The gist of a suit in replevin is to test the plaintiff's right to possession of chattels and the wrongful detention of the chattels by the defendant. *Phillips v. Ockel*, 609 S.W.2d 228, 231 (Mo.App.1980). Title may incidentally become involved in a replevin action, *Hoshaw v. Fenton*, 232 Mo. App. 137, 141, 110 S.W.2d 1140, 1143 (1937), but property rights in the chattel are but ancillary to the dominant right of possession. *Sidney Smith, Inc. v. Steinberg*, 280 S.W.2d 696, 705 (Mo.App.1955). It therefore follows that unless title be specifically pleaded as an issue in the case, neither an interlocutory order nor the final judgment in a replevin suit determines a right of a party to sell the chattels. Ownership and the power of sale depend on collateral documents and agreements, here the security agreement. The replevin suit presented the issue of right to possession but respondent's title was derived from the security agreements.

In the light of these limits on the scope of a replevin suit, which is designed to try only possessory rights, it cannot be successfully contended that Rule 99 is unconstitutional for failure to prohibit a disposition of the property before final judgment. Any rights which the plaintiff obtains pursuant to a replevin writ are limited to the right of possession and therefore if the plaintiff sells the chattels, he does so under a claim of ownership derived from some other source. The title which is purportedly conveyed in such a sale is neither enhanced nor perfected by the order of

---

9. Rule 99.09 entitles the defendant to a hearing on request to determine the plaintiff's right to possession of the property pending trial on the merits. The language suggests that the initial burden at the hearing is on the plaintiff to prove the grounds upon which the writ was issued. The trial judge here apparently viewed the burden to be on the defendants and therefore made no finding as to plaintiffs' right to possession. That error is not of dispositional significance because the bank did prove the grounds set out in the affidavit made to secure the replevin writ at the outset.

delivery. Moreover, in the event the plaintiff is not successful in the replevin suit, he and his sureties are liable to the defendant for the value of the property and for damages if the plaintiff does not have the property to return. Section 533.130. That protection was available to indemnify Loges had it later been determined the livestock was not properly subject to the bank's claim.

■ The other argument Loges makes is somewhat more complex. Appellants contend that there is no provision under Rule 99 for judicial control over the replevin proceedings in that the plaintiff may frustrate the defendant's rights to a hearing under Rule 99.09 and the right to post a re-delivery bond under Rule 99.07 by the simple expedient of selling the chattels immediately as the bank did in this case. Appellants say this amounts to an unconstitutional deprivation of property because the rule affords no judicial process to forestall such conduct.

The most recent pronouncement by the United States Supreme Court setting due process requirements for pre-judgment seizure of personal property is *Mitchell v. W.T. Grant Co.*, 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974). That case withdrew significantly from the earlier decision in *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), which had held due process to require a pre-seizure adversary hearing. (See concurring opinion in *Mitchell* by Mr. Justice Powell, 416 U.S. at 623, 94 S.Ct. at 1908). *Mitchell* holds constitutional due process to be satisfied if seizure is preceded by a factual showing made to a judicial officer of probable cause for the relief, the furnishing of adequate security and provision for an adversary hearing promptly after the seizure occurs, *Mitchell, supra,* 416 U.S. at 606, 94 S.Ct. at 1899. Rule 99 meets these conditions. It provides that the order for the writ of replevin must be issued by a judge, thereby eliminating the possibility that the defendant's property will be taken by an act of a "court functionary." The rule also gives the defendant the right to written notice and an opportunity to request a hearing which must be scheduled within ten days after the filing of the request.

In the present case, the bank fully complied with Rule 99. The replevin order was signed by the circuit judge, adequate security was posted and the adversary hearing was conducted on Loges' request six days after the seizure. Loges says, however, that the procedures were meaningless because the property had been sold by the date of the hearing and Loges could therefore not have obtained re-delivery if it had prevailed at the hearing on the issue of right to possession.

The case of *Seymour Bank v. Kelley*, 715 S.W.2d 586 (Mo.App.1986), presents a similar fact situation in that the plaintiff sold the collateral before trial of the case. The circumstances are dissimilar in that no post-seizure hearing, apart from the ultimate trial on the merits, was conducted. Relying on *Morris Plan Co. v. Excelsior Estates, Inc.*, 540 S.W.2d 44 (Mo. banc 1976), the court held in *Seymour Bank* that defendant had no basis to complain that the affidavit which was presented to secure the replevin order failed to state facts showing the plaintiff was entitled to possession. Both *Morris Plan* and *Seymour Bank* hold that if the final judgment be in favor of the plaintiff's right to possession of the property, any flaw in procedures preliminary to and associated with issuance of the delivery order are not material.[10] It therefore would follow that a defendant who does not prevail on the merits of the case at trial has no basis to complain about the date when the collateral

10. In *Morris Plan,* the order for the writ of replevin was entered by a court clerk contrary to the holding in *State ex rel. Williams v. Berrey*, 492 S.W.2d 731 (Mo. banc 1973). The affidavit in *Seymour Bank* contained the same deficiencies condemned in *State ex rel. Tallen v. Marsh,* 633 S.W.2d 458 (Mo.App.1982). It is difficult to reconcile these decisions with the due process requirements of *Mitchell v. W.T. Grant, supra.* We need not do so here, however, because there is no claim of any departure by the bank from procedures in respect to the content of the affidavit, the issuance of the delivery order or the notice and opportunity for a prompt post-seizure hearing.

is sold. Even were the defendant to prevail, however, recourse to the surety on the bond provides compensation for premature sale of the collateral. The plaintiff in replevin is, in effect, an insurer upon the condition of availability of the collateral.

We conclude appellants' contentions regarding constitutional due process deficiencies are without merit.

### THE FARM MACHINERY SALE

The collateral taken by the bank under the replevin order included the livestock, sold under terms previously described, and farm machinery. After the post-seizure hearing conducted on April 14, 1983 resulted in a finding that the bank was entitled to possession of the collateral, the bank subsequently sought the court's order for a sale of the machinery. On January 31, 1984, the court entered that order which provided what items should be sold, the designation of the auctioneer, the methods for advertisement, the hours of sale and other details. The sale was later held in accordance with the terms of the order and the sum of $233,117.50 was realized.

At trial, Loges asserted that the sale of the machinery was not conducted in a commercially reasonable manner and, in consequence, the fair value of the property was not realized. Loges offered evidence to support the claim, but the bank objected contending that any dispute on the subject was foreclosed by the January 31 order establishing the conditions of the sale. The court ruled in favor of the bank and directed a verdict for the bank on this issue.

Appellants first claim this ruling was in error because the January order was merely interlocutory and therefore not conclusive on the subject. They also say, alternatively, that even if the order had the effect ascribed by the court, when the bank offered evidence as to the condition of the machinery and its sale value, the subject was opened and appellants should have been permitted to offer their own countervailing evidence.

■ Section 400.9–507(2) provides in pertinent part that "[a] disposition [of collateral] which has been approved in any judicial proceeding shall conclusively be deemed to be commercially reasonable[.]" The Uniform Commercial Code, Comment 2 to § 400.9–507 points out that the section, in an appropriate cause, gives the secured party a "means of getting, by court order ... approval of a proposed method of disposition as a commercially reasonable one." Mo.Ann.Stat. § 400.9–507 (Vernon 1965). Although there are no Missouri cases on point, cases in other states have held that if there has been a hearing in which the parties were allowed to voice their objections and comment upon the proposed transaction and thoroughly discuss the sale terms, it is appropriate to make the court's order of sale immune from attack. *Bryant v. American National Bank and Trust Co. of Chicago*, 407 F.Supp. 360, 364–65, and at 365 n. 4 (N.D.Ill.1976); *see Ford Motor Credit Co. v. Traffic Transport Engineering, Inc.*, 150 Mich.App. 205, 209, 388 N.W. 2d 281, 282 (1986); *In re Zsa Zsa Ltd.*, 352 F.Supp. 665, 672 (S.D.N.Y.1972), *aff'd*, 475 F.2d 1393 (D.C.Cir.1973); *American National Bank & Trust Co. v. Robertson*, 384 So.2d 1122, 1125–26 (Ala.Civ.App.1980). Other writers believe the conclusive presumption of commercial reasonableness should be limited to cases in which the hearing judge has scrutinized each aspect of the proposed sale. *Federal Deposit Insurance Corp. v. Forte*, 94 A.D.2d 59, 66, 463 N.Y.S.2d 844, 849–50 (1983); *Rhode Island Hospital Trust National Bank v. National Health Foundation*, 119 R.I. 823, 830, 384 A.2d 301, 305–06 (1978) (Kelleher, J., dissenting). The order entered by the court in this case on January 31, 1984 and the hearing which preceded it met all of the tests the cases and texts propose to render the subsequent sale immune from attack. Once the order became final, a complaint that a sale conducted pursuant to the order was commercially unreasonable was foreclosed. Appellants say, however, that the shield of the January 31 order was not available because the order was interlocutory and therefore subject to modification if the evidence proved the sale as conducted was not commercially reasonable.

The order entered by the trial court in this case was interlocutory in the sense that it decided "some point or matter, but [was] not a final decision of the whole controversy," *see Black's Law Dictionary*, at 731 (5th ed. 1979). The court's reference to an interlocutory sale was referable to the incomplete stage of the proceedings and not to any tentative nature of the sale. There is nothing in the record to indicate that the trial court meant for the order to be anything other than judicial approval of the disposition of the collateral. There is nothing in § 400.9–507 or in the cases cited herein to indicate that "conclusive judicial approval" cannot be given for an interlocutory sale.

The only case cited by appellants on this point is *In re Appalachian Pocahontas Coal Co.*, 31 B.R. 579 (S.D.W.Va.1983). In that case the parties executed a stipulation regarding the sale of the equipment which the court entered as an order. The bankruptcy court indicated that it did not intend the order to give judicial approval to the sale. The case does not aid appellants.

Appellants also claim the trial court erred in concluding that the sale of the machinery was judicially approved and in excluding appellants' evidence that the sale was unreasonable because the bank "opened" the issue of commercial reasonableness by introducing testimony concerning the condition of the machinery, its sale value and the manner in which it was sold.

The trial judge directed a verdict in favor of the bank on the disposition of the machinery issue at the close of all the evidence. Throughout the trial the trial judge indicated it was his position that the sale of the machinery was conclusively deemed reasonable because it was conducted pursuant to a judicial order of sale. The order of sale was admitted into evidence and was "conclusive documentary evidence" that the sale was a disposition approved in a judicial proceeding. *See Bakelite Co. v. Miller*, 372 S.W.2d 867, 871 (Mo.1963). The order, read in light of § 400.9–507(2), dictated the trial judge's decision. No question of fact was left for the jury. *See Coleman v. Jackson County*, 349 Mo. 255, 261, 160 S.W.2d 691, 693 (1942). To make his decision, the trial judge did not need evidence concerning the condition and value of the machinery at the time of sale or the evidence relating the manner of sale. Such evidence was superfluous. With the sale having been deemed reasonable under § 400.9–507, no evidence appellants could have offered relating to the reasonableness of the sale would have made a difference. Refusal to admit evidence cannot constitute reversible error when, had it been received, it would not have changed the result in the case. *Jo B. Gardner, Inc. v. Beanland*, 611 S.W.2d 317, 322 (Mo.App.1980).

In another point associated with the sale of the farm machinery, appellants contend the court erred when it permitted the bank to introduce evidence of certain promissory notes it had purchased, the evidence being adduced to prove the extent of the bank's loss. The circumstances of the notes were these. The bank held a security interest in all the farm equipment replevined, but as to nine of the items, the John Deere Company distributor held prior liens acquired in financing the purchase of the equipment. In order to sell this equipment and convey good title, the bank was obligated to satisfy the debt to John Deere. It acquired the John Deere position by purchasing the notes. The evidence admitted at trial established that the price paid for the notes was $61,335.00. After crediting to appellants' account the total proceeds from sale of collateral, the bank contended it was yet owed a balance of $98,022.50 including the amount paid in satisfaction of the John Deere notes.

The introduction in evidence of the John Deere notes, even if error, could not have prejudiced appellants. This conclusion follows because, according to the figures stated above, the addition of the amount paid to satisfy the John Deere notes merely increased the deficiency balance for which appellants could have been responsible from $36,687.50 to $98,022.50. But the bank has acknowledged that it may not claim any debt by way of a deficiency because the failure to give notice of the sale of the livestock waived that right.

This opinion holds the bank not entitled to sue for that deficiency under the guise of claiming fraud and, therefore, appellants have no liability for any amount of debt beyond that satisfied from the proceeds realized by sale of the collateral. It is immaterial to appellants whether the deficiency be $36,687.50 or $98,022.50.

## THE DIRECTED VERDICT FOR MERCANTILE BANCORPORATION

The replevin suit as originally filed was brought in the name of Sedalia Mercantile Bank and Trust Company as plaintiff. It appears to be undisputed that Mercantile Bancorporation is a bank holding company which has a parent-subsidiary relationship with Sedalia Mercantile Bank. In the counterclaims which appellants filed, they named not only Sedalia Mercantile, but also Mercantile Bancorporation as counterclaim defendants.[11] The theory which appellants pursued at trial against Mercantile Bancorporation was agency, that is, Sedalia Mercantile acted on behalf of and as agent for Mercantile Bancorporation. At the close of all the evidence, the court directed a verdict in favor of Mercantile Bancorporation. Appellants assign that as error.

To determine whether a submissible case is made, the evidence must be viewed in a light most favorable to the plaintiff giving him the benefit of all inferences which may be reasonably drawn from the evidence. *Smith v. Allied Supermarkets, Inc.*, 524 S.W.2d 848, 849 (Mo. banc 1975). If there is substantial evidence to support the plaintiffs' cause of action, the defendants' motion for directed verdict must be overruled. *Goodloe v. Pink*, 683 S.W.2d 653, 655 (Mo. App.1984). Normally, whether a principal-agent relationship exists and whether respondeat superior applies are questions for the jury, but when the facts are undisputed and only one reasonable conclusion can be drawn from them, the matters become questions of law. *See Weinbauer v. Berberich*, 610 S.W.2d 674, 677 (Mo.App.

1980); *Smoot v. Marks*, 564 S.W.2d 231, 236 (Mo.App. banc 1978).

It is undisputed in this case that Sedalia Mercantile is a subsidiary of the parent Mercantile Bancorporation and that Mercantile Bancorporation owns 100% of the stock of Sedalia Mercantile. Neither fact is dispositive of this issue. Shareholders are not ordinarily liable for corporate obligations. *Adelstein v. Jefferson Bank and Trust Co.*, 377 S.W.2d 247, 251 (Mo.1964); 13A W. Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 6213, at 16 (perm. ed. 1984 rev. vol.). Nor does the existence of a parent-subsidiary relationship, without more, subject a parent corporation to liability for the acts of the subsidiary. *Japan Petroleum Co. v. Ashland Oil, Inc.*, 456 F.Supp. 831, 838 (D.Del. 1978); *See* 1 W. Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 43, at 472 (1983); Annot., 7 A.L.R. 3d 1343, 1349 (1966); Annot., 38 A.L.R.3d 1102, 1110–12 (1971). Other factors which, alone, do not an agency situation create are the parent corporation's financing of the subsidiary operations, directors and officers common to both corporations, and a creditor corporation's active participation in the management of a debtor corporation. *Japan Petroleum Co., supra*, 456 F.Supp. at 841. Differences in the corporation powers between a parent corporation and its subsidiary stand in the way of finding an agency relationship.

To show a principal-agent relationship between two corporation entities, "there must be such domination and control 'that the controlled corporation has, so to speak, no separate mind, will or existence of its own and is but a business conduit for its principal.'" *Blackwell Printing Co. v. Blackwell-Wielandy Co.*, 440 S.W.2d 433, 437 (Mo.1969) (quoting Fletcher *Cyclopedia, Corporations*, Permanent Edition, Vol. 1, § 43, at 205). For the parent to be held liable for the subsidiary's acts, the control must be actual, participa-

---

**11.** Mercantile Bancorporation, not having been an original party, would actually be a third party defendant. It did, however, respond to appellants' pleading and no issue was made of the failure to issue summons and third party complaint.

tory and total. 1 Fletcher, *supra*, § 43, at 472–73.

Appellants failed to prove any pervasive involvement by Mercantile Bancorporation in the affairs of Sedalia Mercantile. The evidence upon which appellants relied proved only that Mercantile Bancorporation was a parent company and owned all the shares of Sedalia Mercantile; that as a shareholder, Mercantile Bancorporation did not want Sedalia Mercantile to lose money; that Mercantile Bancorporation had a credit policy which affiliate banks were required to adopt as a guide; that Mercantile Bancorporation officers visited affiliated banks and reviewed their loan portfolios; and, that an officer of Mercantile Bancorporation served as an advisory director of Sedalia Mercantile and occasionally attended board meetings.

None of the foregoing evidence shows any sort of actual, participatory and total control of Sedalia Mercantile by Mercantile Bancorporation. The most control appellants demonstrated was Mercantile's requirement that Sedalia Mercantile follow Mercantile's credit guidelines and submit to a yearly loan review. There was no evidence that Mercantile Bancorporation had to approve loans made by Sedalia Mercantile or that Mercantile Bancorporation made it a practice to dictate how Sedalia Mercantile ran its lending operation. It cannot be said that Mercantile Bancorporation so dominated Sedalia Mercantile that the Sedalia bank had no "separate existence" or "mind of its own." The directed verdict favoring Mercantile Bancorporation was properly granted.

Appellants present a number of other points of alleged error which are not discussed. Several are rendered moot by the resolution of other points in appellants' favor. The remainder involve questions which are unlikely to arise again on retrial, recognizing the benefit of briefing in the course of this appeal which will aid the parties.

## CONCLUSION

For the reasons stated, the judgment in favor of respondent as to Count I, Replev-

in, of the second amended petition is reversed and the cause as to said count only is remanded for a new trial. The judgment in favor of respondent as to Count III, Fraud, of the second amended petition is reversed. The judgment and orders of the trial court are, in all other respects affirmed. Costs are taxed against respondent.

All concur.