**BOATMEN'S BANK OF BUTLER, Appellant,**

v.

**Allen B. BERWALD and Shirley A. Berwald, Respondents.**

**No. WD39167.**

Missouri Court of Appeals, Western District.

April 12, 1988.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 31, 1988.

Application to Transfer Denied July 26, 1988.

Lewis & Rice, Allen S. Boston, Joseph E. Martineau, St. Louis, McNabb & Pursley, H.H. McNabb, Jr., Butler, for appellant.

Harold A. Kyser, Butler, for respondents.

Before COVINGTON, J. Presiding, and SHANGLER and TURNAGE, JJ.

COVINGTON, Judge.

This is an appeal by Boatmen's Bank of Butler from a judgment entered in favor of Allen B. and Shirley A. Berwald for $50,000 actual and $100,000 punitive damages on a counterclaim for prima facie tort in response to Boatmen's action to recover the unpaid principal balance on a promissory note. In addition to the verdict in favor of the Berwalds, the jury returned a verdict in favor of the Bank for the unpaid principal balance of the note. The Bank also appeals from the trial court's refusal to amend the judgment in favor of the Bank to include interest and attorney's fees.

Mr. and Mrs. Berwald were owners and operators of a Holstein dairy farm and herd located near Butler, Missouri. Mr. and Mrs. Berwald borrowed money from the Butler State Bank, which became Boatmen's Bank of Butler, for the purpose of financing the operation of their dairy farm. The credit arrangements commenced in February of 1984 and included various promissory notes secured by deeds of trust and other collateral security agreements.

The Berwalds experienced problems with stray electricity from their milking equipment which caused a decline in milk production and consequent financial problems. Early in 1985, Mr. Edward Ratliff, president and chief executive officer of the Bank, told the Berwalds that the Bank would not extend further credit and recommended that Mr. and Mrs. Berwald investigate selling their cattle.

Because of their financial problems, Mr. and Mrs. Berwald filed for bankruptcy in February, 1985, pursuant to the provisions of Chapter 11 of the United States Bankruptcy Code. At that time the Berwalds were indebted to the Bank in an amount of approximately $500,000, $200,000 of which, although secured, would have been treated as unsecured under the bankruptcy proceedings.

The Bank urged the Berwalds to dismiss their bankruptcy case. Mr. Ratliff drafted an agreement under which the Bank would advance an additional $70,000 to Mr. and Mrs. Berwald for the purpose of paying some of the Berwalds' existing creditors, creating an aggregate loan balance not to exceed $570,000 for a period of one year. Principal and interest payments on the current loan structure were to be continued as scheduled on a prompt basis. Advances on the $70,000 were to be furnished upon the

Berwalds' request subject to approval by the Bank. Although Mr. Berwald initially expressed concern about entering into the agreement because of a change of ownership in the Butler State Bank, the Berwalds ultimately signed the agreement on April 17, 1985, after assurances from a bank officer that the local management would remain the same after the Bank became Boatmen's. The Berwalds dismissed their bankruptcy petition four months after having entered into the agreement. The Bank thereafter advanced additional funds in a total amount of at least $62,000.

On November 29, 1985, the Bank informed Mr. and Mrs. Berwald that the Bank would extend no further credit. The parties dispute whether or not Boatmen's fulfilled its obligations to extend funds under the agreement. Prior to execution of the agreement, Earl Van Slyke, an officer of Boatmen's, had indicated to the Berwalds that he believed the agreement contemplated a commitment to loan up to $570,000 on a revolving line of credit. The Bank, however, later took the position that the agreement did not provide for a revolving line of credit.

Mr. and Mr. Berwald continued to make monthly payments on their indebtedness as required under terms of various notes executed in favor of the Bank.

Because of the financial problems, Mr. Berwald began to investigate the possibility of submitting a bid under a program administered by the United States Department of Agriculture called the dairy buy-out program. Under the program, a dairy producer could submit a bid, which, if accepted, required the farmer to sell his dairy herd for slaughter and to terminate milk production for five years in exchange for proceeds designed to compensate the farmer for the lost income from the cessation of milk production.

The Bank had a security interest in the cattle which the Berwalds were offering for slaughter under the buy-out program. The Bank had no objection to the participation of the Berwalds in the program but informed the Berwalds that their promissory notes should be paid in full.

On February 20, 1986, Mr. Berwald met with bank officials. At that time, the Bank presented Mr. Berwald with two new promissory notes. One was for $334,478.09 and was secured by livestock, farm machinery, commodities, milk equipment, computer feed system, vehicles, trailers, and a real estate deed of trust. The other was for $100,000 and was secured by a second deed of trust on the real estate. The purpose of the larger note was to renew an existing promissory note that had just matured. The purpose of the $100,000 note secured by the second deed of trust was to obtain additional collateral for the Bank because of the prospective loss of the cattle. Mr. Berwald indicated that he would not sign the notes until he learned whether or not he had been accepted in the buy-out program.

Mr. and Mrs. Berwald's bid was accepted on March 31, 1986, under which Mr. and Mrs. Berwald would cease milk production for five years, receive proceeds from the slaughter of the cattle, and receive $384,901.98 the first year and $24,056.37 each of the remaining four years. On April 1, Mr. and Mrs. Berwald signed the two notes previously presented by the Bank in February.

Early in April, the Bank informed the Berwalds that the Bank required an assignment under which, in addition to the proceeds from the sale of the cattle, the first buy-out payment would be used to reduce the Berwalds' outstanding indebtedness of approximately $545,000. Under the Bank's proposal, the remaining indebtedness would be amortized over the following four years. The Bank reiterated the demand on April 16. Mr. Berwald refused to give the Bank the assignment, but proposed an arrangement under which Boatmen's would receive $100,000, which the Berwalds expected to receive from the sale of the cattle for slaughter, and an assignment of $159,000 of the buy-out proceeds. Mr. Berwald based the $159,000 on the difference between what he believed the cattle to be worth and the $259,000 indebtedness which he alleged was specifically secured by the cattle. At that time indebtedness in excess

of $334,000 existed on the note secured by the cattle, vehicles, machinery and equipment. The Bank found Berwald's proposal unacceptable.

On April 15, 1986, the Berwalds paid an installment of $7,556.65 to the Bank.

On April 17, 1986, the Berwald's outstanding indebtedness to the Bank totaled $545,263.91. On that date, the Bank again requested an assignment and Mr. and Mrs. Berwald refused. The Bank then demanded payment of the outstanding indebtedness under the note secured by the cattle, vehicles, and equipment and told the Berwalds that the Bank would be filing an action to replevy the cattle and other security. In addition to demanding payoff, the Bank, under its contractual right, set off $3,300 from the Berwald's bank account against some of the indebtedness under one of the promissory notes. The setoff left the Berwald's bank account with a balance of $548.26.

The Bank's anticipated replevin action was based upon the promissory note dated February 20, 1986, executed by Mr. and Mrs. Berwald on April 1, 1986, in the original principal amount of $334,487.09. The note was secured by a collateral security agreement in which the Berwalds agreed to provide additional collateral satisfactory to the Bank, within twenty-four hours, if, in the Bank's reasonable opinion, the collateral became insufficient to insure payment of the note. Under the agreement, failure to comply with this provision was an act of default.

On April 21, 1986, the Bank filed the replevin action against the Berwalds. On April 25, 1986, a hearing was held on the prejudgment replevin and the petition was dismissed because the verified petition was filed without a supporting affidavit. After the hearing and dismissal, the Bank filed an amended petition in replevin. On April 25, the Bank also sent out written notification to Mr. and Mrs. Berwald that, because of the Berwalds failure to pay an installment due on April 20, 1985, on the note secured by real estate, the Bank was demanding payment in full of all outstanding indebtedness under the real estate note and

commencing foreclosure proceedings under the deed of trust.

Late in the afternoon of April 25, Mr. and Mrs. Berwald went to the Bank with a check for approximately $8,000 to make monthly payments under their promissory notes. The Bank refused to accept the installments because demand on all notes had already been made.

On the weekend of April 26 and 27, 1986, the Berwald cattle were sold by the Berwalds for slaughter.

On April 28, 1986, the court, after hearing, found insufficient evidence to justify prejudgment seizure.

On May 7, 1986, the Berwalds paid $486,927.74 to the Bank by three checks drawn on the Bates County National Bank. The money paid by the Berwalds was applied to the earlier four notes with the balance applied to the $334,478.09 note. An outstanding principal balance of $58,336.17 remained on May 7, 1986. No further payments were made.

On August 20, 1986, the Bank filed suit against the Berwalds for the remaining principal balance due plus interest and attorney's fees. Mr. and Mrs. Berwald counterclaimed in prima facie tort. The jury returned a verdict in favor of Mr. and Mrs. Berwald for actual damages in the amount of $50,000.00 and punitive damages in the amount of $100,000.00. The jury returned a verdict in favor of the Bank on its suit on the promissory note for principal due in the amount of $58,336.17.

The issue to be resolved in the Bank's first point is whether Mr. and Mrs. Berwald established a submissible case of prima facie tort, the sole claim submitted by them. On review, this court will view the evidence in the light most favorable to the Berwalds and determine as a matter of law whether they made a submissible case. *Fricke v. Valley Production Credit Association*, 721 S.W.2d 747, 752 (Mo.App. 1986).

The prima facie tort cause of action was recognized in Missouri in *Porter v. Crawford & Company*, 611 S.W.2d 265 (Mo.App. 1980). *Porter* summarizes the elements of

prima facie tort: (1) intentional lawful act by the defendant, (2) an intent to cause injury to the plaintiff, (3) injury to the plaintiff, and (4) an absence of any justification or an insufficient justification for the defendant's act. *Id.* at 268.

Since *Porter*, the courts of Missouri have significantly limited the application of this tort. *Brown v. Missouri Pacific Railroad Company*, 720 S.W.2d 357, 361–62 (Mo. banc 1986). The court in *Bandag of Springfield, Inc. v. Bandag, Inc.*, 662 S.W.2d 546, 551 (Mo.App.1983), provided that a claim in prima facie tort will not lie where a plaintiff has a claim within a well-defined nominate tort. This court in *Lundburg v. Prudential Insurance Company of America*, 661 S.W.2d 667, 670 (Mo.App.1983), held that proof on the element of intent to injure must be of an "actual intention" to injure, not merely an intent to do the act which may result in the claimed injury. This court has also held that a valid business reason for actions taken by a defendant provides justification sufficient to defeat a prima facie tort claim. *Centerre Bank of Kansas City v. Distributors, Inc.*, 705 S.W.2d 42, 54 (Mo.App.1985).

Mr. and Mrs. Berwald claim that they made out a case in prima facie tort based upon the following evidence: (1) the Bank failed to live up to the August 28, 1985, agreement to extend additional funds to the Berwalds; (2) the Bank's feeling of insecurity was without reasonable basis, and its demand for assignment of the dairy buy-out program proceeds was unjustified; (3) replevin proceedings were brought by the Bank when all notes were current in order to cause the Berwalds to lose the dairy buy-out program even if it meant a loss to the Bank; and (4) the Bank delayed in releasing security after some notes had been paid off, and the Bank failed to account for the amount of the Berwald indebtedness.

When examining the required elements and limitations of the prima facie tort cause of action along with the record in the case, it is clear that the Berwalds did not make a submissible case on each and every element and should not be entitled to recover against the Bank in prima facie tort.

As one basis for their claim, the Berwalds allege that the Bank, upset by the Berwalds' filing of the bankruptcy petition, encouraged the Berwalds to enter into the August 1985 agreement to extend an additional $70,000.00 credit for one year, never intending to live up to the agreement. Consequently, according to their allegation, Mr. and Mrs. Berwald were forced into the dairy buy-out program.

■ Mr. and Mrs. Berwald carry a heavy burden of proving "actual intent" of the Bank to injure them, not merely an intent to do the act allegedly resulting in the claimed injury. *Lundburg*, 661 S.W.2d at 670. "Gross speculation and conjecture cannot fill the role of a reasonable inference for the purpose of making a submissible case." *Id.* at 671. The fact that injury might be the natural and probable consequence of the Bank's act is not sufficient to show the "malice" required for prima facie tort. *Dowd v. General Motors Acceptance Corporation*, 685 S.W.2d 868, 874–75 (Mo. App.1984).

Viewing the evidence in the light most favorable to the Berwalds, the Bank did extend at least $62,000.00 of additional credit to the Berwalds, thus, it could not have intended never to extend credit.

The Berwalds further contend that the institution of the replevin action evidences the Bank's intent to injure them. They assert that Mr. Ratliff knew that under the dairy buy-out program the sale of the dairy cattle would not have to be accomplished until August. Had the sale been delayed, the Berwalds could have received additional income from the dairy operation. Further, under the dairy buy-out program, the cattle were to be sold for slaughter only. If the cattle were disposed of in a manner inconsistent with terms of the dairy buy-out program, the Berwalds would have forfeited $481,000.00 of dairy buy-out proceeds.

When Mr. Ratliff, at trial, was asked whether he realized the problems the replevin would have caused the Berwalds, Mr. Ratliff replied, "That would be his

problem." The somewhat harsh-sounding words of Mr. Ratliff evidence a lack of sensitivity toward the Berwalds' difficulties. The Berwalds, however, adduced no evidence regarding Mr. Ratliff's intent at the time of the replevin proceedings. The Berwalds did not meet their heavy burden of showing actual intent to injure.

Mr. and Mrs. Berwald claim that the Bank's feeling of insecurity was pretextual and that the Bank lacked justification to proceed against them.

■ The burden is on the Berwalds affirmatively to plead and prove absence of justification on the part of the Bank. *Wilt v. Kansas City Area Transportation Authority*, 629 S.W.2d 669, 672–73 (Mo.App. 1982). The Berwalds have failed to adduce evidence sufficient to show absence of justification.

Under the security agreement, a call for more collateral was justified if the Bank, in its reasonable opinion, believed the collateral to be insufficient to insure payment of the outstanding indebtedness.

■ The Berwalds failed to adduce evidence sufficient to show that the Bank was not reasonable in its stated feeling of insecurity. The Berwalds' testimony showed that at the time the Bank demanded the assignment of proceeds from the dairy buy-out program, the Berwalds believed the cattle to be worth $100,000 if sold for slaughter. They offered no evidence, however, of the value of the other collateral, the equipment, machinery and vehicles. The total value of all collateral, both real and personal, could not be ascertained from the evidence adduced.

The Berwalds contend that they were current in their payments, and, thus, the Bank lacked justification to call the notes. Under the collateral security agreement, however, failure to provide additional collateral within 24 hours of demand was also an act of default.

The Berwalds contend that their offer of an assignment of an amount to equal the difference between the anticipated proceeds from the sale of the cattle ($100,000) and the amount of indebtedness they claimed was secured by the cattle ($259,000) was sufficient to satisfy the Bank's feeling of insecurity. The Berwald calculations, however, were erroneous. More than $259,000 was secured by the cattle.

The Berwalds contend that the Bank had already "shored up" its position by obtaining the $100,000 promissory note secured by a second deed of trust on the real estate. The Berwalds adduced no competent evidence, however, to prove that the existence of the additional note rendered a demand for additional collateral unreasonable.

Although the Bank presented evidence of justification, such evidence, unless favorable to the Berwalds, is not properly considered by this court in review of the submissibility of the Berwalds' case. The Bank's evidence in this regard was not favorable to the Berwalds' claim. The Berwalds failed to make a submissible case.

The Bank claims additional error. The jury returned a verdict in favor of the Bank on the sued-upon promissory note for the unpaid principal balance of $58,336.17. The jury verdict did not include an award for interest or attorney's fees. The trial court denied the Bank's motion to correct the jury verdict, which sought an amendment in the judgment to include an award for interest and attorney's fees.

Mr. and Mrs. Berwald contend that, because the Bank failed to return the paid notes to them, they had no way of knowing how much they owed and should not be held liable for interest on a disputed amount. They also contend that because the Bank failed to account to them for the manner in which payments were applied on the various notes held by the Bank, and because there was no evidence as to whether the other four notes contained provisions for interest and attorney's fees, the jury was justified in refusing to award interest and attorney's fees.

■ Once the jury has found for a party on a promissory note, its damages in the form of principal, interest, and attorney's fees follow as a matter of law. The trial court may calculate these amounts and en-

ter judgment accordingly. *Campbell v. Kelley,* 719 S.W.2d 769, 772 (Mo. banc 1986).

■■ Although, as a general rule, interest cannot be awarded as part of damages if the basic damages are unliquidated, it is the character of the claim, and not of the defense to it, that determines whether it is liquidated. When the amount due or to become due is fixed by agreement between the parties, the claim may be said to be liquidated so as to bear interest, despite the defendant's denial of liability, or even the existence of a bona fide dispute as to the amount of the indebtedness. *Twin River Construction Company v. Public Water District,* 653 S.W.2d 682, 695 (Mo.App. 1983).

Under the language of the promissory note, interest accrued on the "unpaid principal balance at a rate of 13.25 percent per annum payable monthly and from maturity at a rate of 2 percent above the stated rate." An additional term of the note provided: "If this note be not paid at maturity and if it should be placed in the hands of an attorney for collection, the parties hereto agree to pay ... fifteen percent of the amount due as an attorney's fee."

■ The claim and interest in this case were fully liquidated in nature, having been fixed by agreement of the parties in the sued-upon note. The principal, interest, and attorney's fees can be calculated from the face of the note. This opinion has previously addressed Mr. and Mrs. Berwald's contention that they had no idea how the payment was applied.

■ The court is an expert on attorney's fees and may award reasonable amounts as a matter of law. *Campbell v. Kelley,* 719 S.W.2d at 772. Provisions in a note for attorney's fees based upon a specified percentage of the note are valid, *Murphy v. Grisham,* 625 S.W.2d 215, 217 (Mo. App.1981), and the holder is entitled to judgment for that amount without proof that it is reasonable, absent a pleading that it is unreasonable. *Emmons v. Winters,* 627 S.W.2d 904, 907 (Mo.App.1982). Mr. and Mrs. Berwald have not challenged as excessive the attorney's fees provided in the note.

The Bank was entitled to interest and attorney's fees as a matter of law.

The judgment in favor of the Berwalds is reversed. The judgment in favor of the Bank is affirmed and remanded with instructions to modify the judgment to include an award of interest from May 7, 1986, at the rate specified in the note, and to award attorney's fees as provided in the note.

All concur.