Robert M. SPERRY and Melinda J. Lubis as statutory trustees for Computer Merchants, Inc., and Robert M. Sperry and Melinda J. Lubis, individually, Appellants,

v.

ITT COMMERCIAL FINANCE CORPORATION and Dominic Gerard Pilla, Respondents.

No. WD 42391.

Missouri Court of Appeals,
Western District.

Oct. 16, 1990.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 4, 1990.

Application to Transfer Denied
Jan. 9, 1991.

Gordon N. Myerson, Kansas City, for appellants.

Daniel M. Dibble, Kansas City, for respondents.

Before KENNEDY, P.J., and SHANGLER and GAITAN, JJ.

GAITAN, Judge.

This is a tort action where plaintiffs and appellants, Robert M. Sperry and Melinda

J. Lubis, statutory trustees for Computer Merchants, Inc. seek to reinstate a jury verdict in their favor and against defendants-respondents, ITT Commercial Finance Corporation and Dominic G. Pilla. The trial court granted a judgment notwithstanding the verdict. We affirm.

### Pretrial Procedural Matters

In 1986, the now-defunct Computer Merchants, Inc., was a retail computer vendor with locations in Overland Park, Kansas, and Jefferson City and Osage Beach, Missouri. Computer Merchants and its corporate predecessors, Bob Sperry's Computers, Inc., and Century Next Computers, Inc., obtained inventory financing from ITT Commercial Finance Corp. ("ITT"), under an agreement for wholesale financing dated December 17, 1984, and an identical agreement dated February 13, 1985 (hereinafter collectively referred to as "the security agreement").

In paragraph 3 of the security agreement, Computer Merchants granted ITT a security interest in all inventory, machinery, equipment, and fixtures "wherever located and whether or not financed under this agreement." In paragraphs 7 and 9 of the security agreement, Computer Merchants agreed to pay all assessments and charges when due, and to pay "the full amount of the principal balance immediately when each of the goods is sold, lost, stolen, destroyed, or damaged or when payment is required under the terms of [ITT's] financing program, whichever occurs first." ITT monitored Computer Merchants' performance of this payment obligation by conducting periodic "floor checks" to determine what inventory had been sold, lost, stolen, destroyed, or was otherwise unaccounted for.

ITT performed such a floor check on March 6, 1986, and determined that approximately $12,771 worth of merchandise was sold or otherwise unaccounted for. ITT demanded immediate payment from Melin-

da J. Lubis (Lubis), then president of Computer Merchants. Lubis refused, claiming that Computer Merchants did not have the money. On March 10, 1986, Computer Merchants again refused to pay. Pursuant to paragraphs 13(c) and 17 of the security agreement, ITT declared a default and demanded that Computer Merchants surrender collateral for the indebtedness. Throughout this proceeding the parties disagreed whether ITT demanded all, or only part, of the collateral. Plaintiffs contended that ITT demanded "floorplan inventory only" and that plaintiffs agreed to surrender *only* that inventory. Defendants insisted that they demanded, and plaintiffs agreed to surrender, *all* collateral.

In paragraph 13 of the security agreement, Computer Merchants agreed to the following conditions with respect to default:

> 13. If we do not comply with any of the terms of this agreement, ... or whenever you in good faith deem the debt or the goods insecure:
>
> (a) You may call all or any part of the amount ... due and payable immediately, ...
>
> (b) We shall hold and keep the goods in good order for your benefit and shall not exhibit or sell them;
>
> (c) Upon your demand, we shall deliver the goods to you in good order at a place you choose that is reasonably convenient to both of us ...

On March 11, 1986, ITT repossessed inventory, machinery, equipment and fixtures from the three Computer Merchants stores. On May 7, 1986, Computer Merchants filed suit against ITT and its branch manager, Dominic Pilla, demanding $1,800,000 actual damages and $4,000,000 punitive damages on each count of a five-count petition for wrongful repossession (Count I), conversion (Count II), trespass (Count III), outrageous conduct (Count IV), and prima facie tort (Count V).[1] All such counts were premised on Computer Merchants' claim

---

1. Computer Merchants forfeited its corporate charter on January 1, 1987. Thereafter, plain-

that it offered to let ITT pick up property which ITT had floor-planned, but that ITT had wrongfully taken additional property as well.

Defendants denied liability and asserted numerous defenses to plaintiffs' claims. ITT also advanced three counterclaims: Count I sought a deficiency judgment of approximately $200,000 plus collection costs and attorneys' fees, on the indebtedness due ITT from Computer Merchants; Count II sought to recover on Sperry's personal guaranty of said indebtedness; and Count III sought actual and punitive damages from Sperry and Lubis, individually and as trustees for Computer Merchants, for conversion and conspiracy to defraud.

On July 7, 1988, defendants filed a motion for partial summary judgment. After extensive briefing by the parties, consideration of affidavit and depositions, and oral argument, the trial court on April 12, 1989, sustained defendants' motion as to four key issues. Specifically, it held that the following points were undisputed or established as a matter of law, and required no proof at trial.

1. Pursuant to the security agreement, ITT had a valid and enforceable security interest in all inventory, machinery, equipment and fixtures of Computer Merchants;

2. On March 11, 1986, Computer Merchants was in default under the security agreement because it had failed to timely pay all current debts owed to ITT for principal and charges;

3. Except to the extent that said inventory, machinery, equipment, and fixtures were owned by persons or entities other than Computer Merchants, ITT had a valid and enforceable right to possession of said inventory, machinery, equipment, and fixtures; and

4. In conducting the repossession, ITT did not breach the peace.

The court scheduled all remaining issues for trial on May 15, 1989. On April 21, 1989, defendants filed further motions for summary judgment on each specific count of plaintiffs' third amended petition. Again the parties briefed all issues and presented extensive argument. Immediately before trial, on the morning of May 15, 1989, the trial court sustained defendants' motions for summary judgment on plaintiffs' claims for wrongful repossession (Count I), outrageous conduct (Count IV), and prima facie tort (Count V).

The case proceeded to trial on plaintiffs' claims for conversion (Count II) and trespass (Count III), and on defendants' counterclaims for a deficiency judgment (Count I), for recovery on Sperry's personal guaranty (Count II), and for actual and punitive damages for conversion and conspiracy to defraud (Count III).

At the time the trial court entered partial summary judgment for defendants, it ordered the parties to file motions in limine by May 5, 1989. Pursuant to this order, defendants filed a motion asking that the trial court prohibit plaintiffs from mentioning to the jury the following items of alleged damage to Computer Merchants:

a. total destruction of the fair market value of the company, in the amount of $1,200,000;

b. loss of a $600,000 tax loss carry-forward;

c. loss of the IBM and Apple dealerships;

d. loss of credit standing and inability to repay loans totalling $800,000; and

e. loss of leaseholds and leasehold deposits.

Defendants argued, *inter alia*, that such items were not proper items of damage for conversion or trespass, and that evidence

tiffs Robert M. Sperry and Melinda J. Lubis maintained suit as statutory trustees for Com-

puter Merchants under Mo.Rev.Stat. § 351.525 (1986).

of such losses would be highly prejudicial to defendants. The trial court agreed, and so restricted the appellants.

### Events Culminating in Litigation

The repossession occurred on Tuesday, March 11, 1986. Early that morning, Schifferdecker and Weir, agents for defendants, went to Jefferson City. Mike Day, who managed that store, had spoken directly with Sperry and Lubis about ITT's scheduled visit. Sperry had told him that ITT was "coming down to Jeff City," but had not told him that some inventory should stay or that other inventory should go. ITT did not bring a list of the floorplan inventory and the Jefferson City employees did not have or ask for one. Schifferdecker and Weir asked if it was okay to pick up their merchandise. The employees said "fine," sat back, and let ITT take what it wanted. If Day told Schifferdecker and Weir not to take something, however, they did not take it. For example, at one point, Day discovered that personal computers belonging to the Missouri Farm Bureau had been removed from the service area. Day returned them to the service area without reported incident.

The repossession took perhaps an hour, and was uneventful. One Computer Merchants employee testified that it was not hostile or argumentative, and described it as "low-key" and "real quiet." During the repossession, no one objected, asked ITT to leave, or even called Sperry or Lubis to report what was happening. The store employees were helpful and courteous and made no protest.

After Jefferson City, Schifferdecker and Weir went to Osage Beach. Sales clerk Kim Leutzinger was alone in the store. She was helpful and courteous, and did not object to any part of the repossession or ask ITT to take only certain property. The repossession was orderly and "very routine."

Before repossession, The School of the Osage took an Apple II-e computer to the Osage Beach store for repair. Store manager Art Langston testified that the Apple II-e was gone after the repossession. Langston was not present during the repossession and, therefore, had no actual knowledge whether ITT had removed it, but opined that no one besides ITT could have removed it. The computer was never repaired or returned to the school, but shortly after the repossession, the manufacturer replaced it free of charge. The school had no complaint with anyone and, in fact, executed a release of any claims which it had in that regard.

Back in Kansas, Mr. Nestler, agent for defendants, had taken a U–Haul truck to the Overland Park store at about 10:30 a.m. on the morning of March 11. According to Lubis, Nestler asked her to point out the floorplan inventory and he then started to load it. Pilla arrived at about 11:00 or 11:30 a.m. The front door was locked, so he went around back to the garage and loading dock, where he saw Lubis and went in. Lubis testified that Pilla asked if ITT could just take everything and settle up later, but that she responded "absolutely not." Pilla, who was present for a short time, denied this specific conversation. Lubis admitted, however, that "at all times" she understood that ITT was going to repossess non-floorplan property. In addition, Sperry admitted that at the time of the repossession, ITT was demanding "the goods," as defined in the security agreement. Neither Sperry nor Lubis told Pilla to leave, however, or asked defendants to go get a court order. Pilla stayed for half an hour, saw Nestler, told him to continue, and returned to his office.

At the close of plaintiffs' evidence, the trial court sustained defendants' motion for a directed verdict on plaintiffs' claim for conversion. As to the McAuley and school district equipment, the trial court found that there was "no evidence of any damage sustained that is recoverable under the theory of conversion." As to the IBM software, the trial court held that plaintiffs had failed to show that IBM had perfected a

consignment security interest under the Uniform Commercial Code therefore giving it a claim of possession superior to that of ITT under Mo.Rev.Stat. § 400.9–114(1) (1986).

Notwithstanding the court's rulings to the contrary, plaintiffs' trial counsel put before the jury the alleged facts that ITT's repossession: Put Computer Merchants out of business; caused Computer Merchants to lose its Apple and IBM franchises; reduced Sperry to temporary work as a computer repairman; cost Lubis her job; exposed Sperry to personal liability on his guaranty of $760,000 in corporate debts of Computer Merchants; caused Computer Merchants to default on loans totalling $800,000; and caused Computer Merchants to lose its lease.

Prior to trial, the trial court expressly instructed plaintiffs' counsel not to get into the net worth of ITT's corporate affiliates. Therefore, when plaintiffs' counsel elicited that ITT Corporation had a net worth of between $8,000,000,000 and $9,000,000,000, defendants moved for an immediate mistrial. The trial court denied the motion. Thereafter, the defendants moved to sever their counterclaim. Their motion was sustained.

At the close of plaintiffs' case, the trial court sustained defendants' motion for directed verdict with respect to conversion (Count II), and submitted plaintiffs' remaining claim for trespass to the jury. The jury returned a verdict which held both defendants liable for trespass. It awarded plaintiffs $1 actual and $4,000,000 punitive damages from ITT, and $1 and $10,000 punitive damages from Pilla.

Thereafter, defendants moved for a judgment notwithstanding the verdict, or in the alternative, for a new trial. The trial court sustained the motion for a judgment notwithstanding the verdict holding that plaintiffs had failed to make a submissible case of trespass because, among other things, the security agreement had irrevocably authorized defendants to enter plaintiffs' premises to conduct a peaceful repossession upon default. In the alternative, in the event that its judgment notwithstanding the verdict was reversed on appeal, the trial court granted defendants a new trial on all issues. In doing so, it held, *inter alia* that: (1) the verdict was against the weight of the evidence; (2) the punitive damage award was grossly excessive and violated defendants' procedural and substantive rights under the Missouri and United States Constitutions; (3) plaintiffs' counsel engaged in willful, egregious attorney misconduct which could not be cured except through a new trial; and (4) the trial court had erred in giving various jury instructions.

## I.

### A. Limited License

■ Plaintiffs insist that they made a submissible case of trespass. Plaintiffs' theory is that in March of 1986 they verbally gave ITT a limited license to repossess floorplan inventory only; that defendants exceeded the scope of that license by taking non-floorplan inventory; and that defendants' excess caused the entire license to be forfeited and rendered their entry a trespass.

■ A case should not be submitted to the jury unless each and every fact essential to liability is shown by legal and substantial evidence. *Owens v. Union Elec. Co.*, 729 S.W.2d 248, 250 (Mo.App.1987). Plaintiffs' case did not meet this test with respect to either liability or damages. Defendants were, therefore, entitled to judgment notwithstanding the verdict. *Peete v. Equitable Life Assurance Society*, 697 S.W.2d 232, 235 (Mo.App.1985).

■ Plaintiffs' "limited license" theory is flawed. First, under the Uniform Commercial Code as codified in the statutory law of Missouri (Mo.Rev.Stat. § 400.9–503 (1986)) and Kansas (Kan.Stat.Ann. § 84–9–503 (1983)), defendants had an absolute legal privilege to enter plaintiffs'

property to peacefully repossess all collateral in the event of default. Second, the security agreement gave defendants an irrevocable contractual right of entry for that purpose. *See* Restatement (Second) of Torts § 183 (1965); *see also Smith v. Spradling,* 532 S.W.2d 202, 206 (Mo.1976). Third, any verbal agreement to limit the scope of ITT's repossession or condition its right of entry was unenforceable for lack of consideration. An agreement to do what one is already legally bound to do is not sufficient consideration for a contract modification. *Twin Rivers Const. Co., Inc. v. Public Water Dist. No. 6,* 653 S.W.2d 682, 690 (Mo.App.1983).

For all of the foregoing reasons, plaintiffs' "limited license" theory was defective, and the trial court properly entered judgment notwithstanding the verdict. The burden is on appellants to demonstrate that this action was in error. *Missouri Health Facilities Review Comm. v. Administrative Hearing Comm'n of Missouri,* 700 S.W.2d 445, 451 (Mo. banc 1985); *Delaney v. Gibson,* 639 S.W.2d 601, 604 (Mo. banc 1982); *Schlanger v. Simon,* 339 S.W.2d 825, 831 (Mo.1960). Plaintiffs have not met that burden.

### B. Punitive Damages

■ The trial court expressly held that plaintiffs did not make a submissible case of punitive damages, and that defendants were, therefore, entitled to judgment notwithstanding the verdict on that issue.

Plaintiffs' argument is premised upon a flawed understanding of the legal standards which govern the award of punitive damages in Missouri. In *Burnett v. Griffith,* 769 S.W.2d 780 (Mo. banc 1989), the Missouri Supreme Court held that to recover such damages in an intentional tort case, plaintiffs must "prove that defendant's evil hand was guided by an evil mind," or demonstrate conduct that is outrageous because of "defendant's evil motive or reckless indifference to the rights of others." *Id.* at 787.

Plaintiffs in this case did not present substantial evidence that defendants' conduct was motivated by evil intent or was done with reckless indifference to the rights of plaintiffs.

### C. Intentional Trespass by Pilla

■ Pilla was at the Overland Park store for less than one hour. He entered through an open door, talked with Lubis and Nestler, and left. Nobody asked him to leave and, in fact, Lubis willingly engaged him in conversation.[2] Pilla did not remove any property, floorplan or otherwise. Clearly, Pilla did not trespass on plaintiffs' premises.

Plaintiffs do not seriously contend that Pilla himself committed trespass. They insist that he is vicariously liable, however, because he was the "guy in charge" and directed the acts of "his employees." In so arguing, plaintiffs seem to rely upon a hybrid theory of respondeat superior and aiding and abetting. Their theory is misguided.

Respondeat superior doctrines are inapplicable because the alleged wrongdoers in this case were not Pilla's agents or employees. ITT was the principal. Pilla, Austin, Nestler, Schifferdecker, and Weir were all fellow agents or employees, acting within the course and scope of their employment for ITT. Further, plaintiffs did not seek to hold Pilla liable under an aiding and abetting theory as recognized by Missouri case-

---

**2.** In that respect, this case is similar to *Boling Concrete Const. Co., Inc. v. Townsend,* 686 S.W.2d 842 (Mo.App.1985), where the trial court sustained plaintiffs' motion for summary judgment on defendants' counterclaim for trespass. The Missouri Court of Appeals affirmed, holding as follows:

> One who silently watches another enter upon the former's land and then willingly engages the latter in conversation while standing upon the premises may not later be heard to complain of trespass. "Consent may be implied ... from conduct."

686 S.W.2d at 843 (citing 75 Am.Jur.2d *Trespass* § 41 (1974)).

law. *See Curlee v. Donaldson,* 233 S.W.2d 746, 753 (Mo.App.1950). That theory was unsupported by substantial evidence. The plaintiffs failed to support their arguments on this point.

### D. The Punitive Damages Against ITT

■ Appellants allege that the trial court erred in granting defendants' motion for judgment notwithstanding the verdict because a $4,000,000 punitive damage award was supported by the evidence, was within the jury's discretion, and was not excessive. This argument misses the point. The trial court did not vacate the punitive damage award because it was excessive, but because "plaintiffs failed to make a submissible case that defendants' conduct was outrageous due to evil motive or reckless indifference to the rights of others."

The order by a trial court granting a new trial because the verdict is against the weight of the evidence is presumptively correct, *Goodin v. May,* 474 S.W.2d 33, 34 (Mo.App.1971), and the burden of proving it erroneous rests upon the appellant. *Bernard McMenamy Contractors, Inc. v. Missouri State Highway Comm'n,* 582 S.W.2d 305, 315 (Mo.App.1979), *overruled on other grounds, Coluccio v. Springfield,* 779 S.W.2d 550, 552 (Mo. banc 1989); *Smith v. City of Clayton,* 579 S.W.2d 675, 677 (Mo. App.1979). Plaintiffs have not met this burden.

### E. Limitations on Plaintiffs' Evidence

■ Plaintiffs claim that the trial court erroneously excluded evidence of the following damages:

a. destruction of the value of their business, in the amount of $1,257,580;

b. loss of a $600,000 tax loss carry-forward;

c. loss of their IBM and Apple dealerships;

d. inability to repay loans totalling $800,000; and

e. loss of leaseholds and leasehold deposits.

Plaintiffs also complain that the trial court erred in giving Instruction 9, which limited their actual damage recovery to $1. Plaintiffs have not appealed the giving of Instruction 9 and have not cited it in full in the argument portion of their brief, as required by Rule 84.04(e) of the Missouri Rules of Civil Procedure. However, we shall examine this point *ex gratia.*

■ The proper measure of damages for trespass is the difference in the value of plaintiffs' property immediately before and immediately after the trespass, *Sumpter v. J.E. Sieben Const. Co.,* 492 S.W.2d 150, 154 (Mo.App.1973), or the cost of restoration, whichever was less, *Welker v. Pankey,* 225 S.W.2d 505, 508 (Mo.App. 1949). *See also Beetschen v. Shell Pipe Line Corp.,* 248 S.W.2d 66, 72 (Mo.App.), *affirmed,* 363 Mo. 751, 253 S.W.2d 785 (1952). Plaintiffs did not seek such damages in this case, and the damages which they did seek were not the natural, necessary, direct and proximate consequence of any conceivable trespass. Therefore, they were not recoverable. *Crook v. Sheehan Enter., Inc.,* 740 S.W.2d 333, 336 (Mo.App. 1987).[3]

Consequently, plaintiffs failed to make a submissible case of any actual damages which were the natural, necessary, and proximate result of the alleged trespass. Accordingly, the trial court did not err in limiting the proof of such damages or limiting plaintiffs' recovery under Instruction 9.

### II.

■ Plaintiffs argue that the security agreement "does not apply" and that

---

**3.** Furthermore, such damages were items of special damage which plaintiffs were required to specifically plead. *Weller v. Hayes Truck Lines,* 355 Mo. 695, 197 S.W.2d 657, 663 (1946); *Hicks v. Shanabarger,* 241 Mo.App. 476, 236 S.W.2d 49, 54 (1951). Plaintiffs did not plead any damages arising from loss of tax benefits, inability to meet debt service obligations, or loss of leases and leasehold deposits. Evidence of such damage was, therefore, inadmissible. *Ziervogel v. Royal Packing Co.,* 225 S.W.2d 798, 802 (Mo. App.1949); *W.C. Hardesty Co. v. Schaefer,* 139 S.W.2d 1031, 1035 (Mo.App.1940).

the trial court, therefore, erred in holding that it gave defendants irrevocable consent to enter plaintiffs' premises to conduct a peaceful repossession in the case of default. The plaintiffs cite no authority for their argument. First, ITT had no duty to "require a new agreement" when Century Next changed its name; the security agreement was binding on the successors of Century Next, and a new agreement was superfluous. Second, demand is irrelevant. The security agreement did not require demand and, as a matter of law, neither a demand for repossession nor consent of the debtor is required before the creditor is entitled to take possession. *Thompson v. Ford Motor Credit Co.*, 550 F.2d 256, 258 (5th Cir.1977); *Pierce v. Ford Motor Credit Co.*, 373 So.2d 1113, 1115 (Ala.App.1979); *Phil Phillips Ford, Inc. v. St. Paul Fire and Marine Ins. Co.*, 454 S.W.2d 465, 468 (Tex.App.1970) *aff'd*, 465 S.W.2d 933 (Tex. 1971). Furthermore, if demand was necessary, demand was made. Sperry and Lubis were present at the repossession and understood that demand was being made for all collateral. Finally, the reason for Computer Merchants' default is irrelevant.

■ Plaintiffs claim that ITT breached its obligation of good faith and honesty in the performance or enforcement of the security agreement under Section 1–203 of the Uniform Commercial Code, Kan.Stat. Ann. § 84–1–203 (1983), Mo.Rev.Stat. § 400.1–203 (1986). Defendants' good faith is irrelevant to their liability for trespass. Bad faith is not an element of trespass, good faith is not a defense to a trespass claim, and plaintiffs did not sue ITT for breach of any obligation of good faith and honesty.

■ Plaintiffs argue that defendants breached the peace in taking non-floorplan property over their objection, that the trial court erred in granting defendants partial summary judgment on this issue prior to trial, and that the issue should have been decided by a jury.

Missouri and Kansas courts have expressly held that no breach of peace occurs when a repossession is non-violent, even if the debtor objects. The vast weight of legal authority is consistent with this view. *Owens v. First Am. Nat'l Bank of Nashville, Tenn.*, 6 UCC Rep.Serv. 427, 433 (Tenn.App.1968) (mere repossession without consent of debtor not breach of peace); *Thompson v. Ford Motor Credit Co.*, 550 F.2d 256, 258 (5th Cir.1977) (lack of consent immaterial where repossession not secured through actual or constructive force, even if creditor "connived"); *Phil Phillips Ford, Inc. v. St. Paul Fire and Marine Ins. Co.*, 454 S.W.2d 465 (Tex.App.1970) (high-handed, surreptitious, reprehensible conduct of creditor not breach of peace), *aff'd* 465 S.W.2d 933 (Tex.1971); *Global Casting Indus., Inc. v. Daley–Hodkin Corp.*, 105 Misc.2d 517, 432 N.Y.S.2d 453, 455, 31 UCC Rep.Serv. 377 (1980) (entry with assistance of blacksmith not breach of peace even if chains cut); *Cox v. Galigher Motor Sales Co.*, 158 W.Va. 685, 213 S.E.2d 475, 479 (W.Va.App.1975) (repossession through deceit not breach of peace). Consistent with this view, numerous cases have recognized that a secured party may take peaceable possession of the collateral without the consent, and even over the protest, of the debtor. *Ford Motor Credit Co. v. Cole*, 503 S.W.2d 853, 855 (Tex.App.1973). *Bordeaux v. Hartman Furniture & Carpet Co.*, 115 Mo.App. 556, 91 S.W. 1020 (1905), is precisely on point. There, the debtor had forbidden the repossession and, although his wife let defendant in the house, defendant was there against the debtor's will. The Court held that in proceeding under such circumstances, defendant was "courting resistance" and "inviting" a breach of peace. *Id.* 91 S.W. at 1022. It nonetheless held that no breach of peace had occurred because the repossession, though "forceable," was non-violent. Because no resistance was made, the non-consensual nature of the repossession afforded no basis for recovery. *Id.* at 1021–22.

Kansas law is similarly on point. In *Wade v. Ford Motor Credit Co.*, 8 Kan. App.2d 737, 668 P.2d 183, 184 (1983), the jury awarded plaintiff actual and punitive

damages for wrongful repossession and conversion. The Kansas Court of Appeals reversed. Defendant had attempted to repossess plaintiff's car. Plaintiff ordered him off the premises, claiming that she had a gun in the house and would use it if he came back. Plaintiff later called defendant's office and threatened that "if she caught anyone on her property again trying to take her car, ... [she] 'would leave him laying right where [she] saw him.'" *Id.* 668 P.2d at 184. Thirty days later, defendant made a second attempt to repossess. No confrontation occurred and plaintiff did not learn of the repossession until after defendant had safely departed with the car. The trial court held that defendant had breached the peace because plaintiff "in no way" consented to the repossession and defendant had knowingly and willfully created a situation where violence could ensue. In the trial court's view, the "great potential for violence" rendered defendant liable for breach of peace even though that potential did not materialize.

The Kansas Court of Appeals reversed. In doing so, it held that a debtor's refusal to consent does not, in itself, require the creditor to resort to legal channels to recover its collateral. *Wade v. Ford Motor Credit Co.*, 668 P.2d at 189. The court rejected plaintiff's argument that self-help is available only in "those amicable situations where there was no dispute." *Id.* at 188. It reasoned as follows:

> [Section 9–503], by its very existence, *presupposes that the defaulting party did not consent.* Should the defaulting party consent, no statutory authority would be required for a secured party to repossess, with or without judicial process. To hold otherwise would emasculate that statute.

*Id.* at 188 (citing *Census Federal Credit Union v. Wann*, 403 N.E.2d 348, 351 (Ind. App.1980)). Accordingly, notwithstanding

a communicated "potential for violence," the court held as a matter of law that defendant had not breached the peace. *See also Motor Equip. Co. v. McLaughlin*, 156 Kan. 258, 133 P.2d 149 (1943) (creditor authorized to take peaceable possession even against will of debtor); *Benschoter v. First National Bank of Lawrence*, 218 Kan. 144, 542 P.2d 1042 (1975) (breach of peace not committed where creditor uses "stealth" in repossession).

The critical factors in *Bordeaux* and *Wade*, as here, are that: (1) the actual repossession was non-violent; and (2) the circumstances of the repossession were such that "in all likelihood" no confrontation would materialize. In *Wade*, plaintiff was unaware of the repossession until after defendant had successfully left the premises. *Id.* at 189. Similarly, in this case, plaintiffs were unaware that defendants were removing non-floorplan collateral or, in the alternative, knew what defendants were doing and chose not to protest.

### III. Conversion

Plaintiffs complain that the trial court "inexplicably directed a verdict for defendants on plaintiffs' conversion claim at the close of plaintiffs' evidence." In its summary judgment order of April 12, 1989, the trial court held that except to the extent that ITT seized property owned by third parties, ITT had a valid and enforceable right to all of the property which it repossessed. This holding is not appealed, and it disposes of plaintiffs' claim for conversion of all property except (1) Mark McAuley's printer; (2) the school district computer; and (3) the IBM consignment software.[4] Plaintiffs admittedly did not own this property, and any effort to recover damages for its conversion was governed by the law of bailment.

---

**4.** Plaintiffs claim that defendants also seized telephones, telephone switches, a microwave oven, bathroom scales, and repair manuals which were not within the scope of ITT's security agreement. All such items constituted inventory, equipment, fixtures, or accessories of Computer Merchants, however, and they clearly fell within the scope of ITT's security interest. The circuit court so held on April 12, 1989, and that portion of its order has not been appealed.

■ The trial court also acted properly in holding that plaintiffs had failed to make a submissible case for conversion of the IBM consignment software. As a matter of law, IBM's interest in the consignment software was superior to that of ITT only if IBM complied with § 9–114 of the Uniform Commercial Code, Mo.Rev.Stat. § 400.9–114 (1986) and Kan.Stat.Ann. § 84–9–114 (1983).[5] Plaintiffs did not demonstrate that IBM complied with these statutes.

## IV. Prima Facie Tort

■ In Count IV of their third amended petition, plaintiffs sought $1,800,-000 actual and $4,000,000 punitive damages for prima facie tort. The critical question, and the one on which defendants premised their motion for summary judgment, was lack of justification. Lack of justification is an indispensable element of prima facie tort under *Porter v. Crawford & Co.*, 611 S.W.2d 265, 268 (Mo.App.1980). The trial court determined that ITT had a legal right to repossess all of its collateral because Computer Merchants was in default, and that in conducting the repossession, ITT did not breach the peace. Defendants, therefore, argued that plaintiffs could not make a submissible case of lack of justification. The trial court agreed, and we concur.

Two cases illustrative of the point of lack of justification are cited below.

In *Centerre Bank of Kansas City, N.A. v. Distrib., Inc.*, 705 S.W.2d 42 (Mo.App. 1985), a jury concluded that Centerre had acted without justification in calling a promissory note, and awarded the maker

$480,000 actual and $1,000,000 punitive damages for prima facie tort. On appeal, the Missouri Court of Appeals reversed. Notwithstanding evidence of personal animosity and intent to injure, it held that the bank had a valid reason for calling the note: it had a legal right to do so, a valid economic interest in doing so, and its action was neither unfair nor morally offensive. *Id.* at 54. The Court held that said justification was sufficient as a matter of law to defeat a claim for prima facie tort.

Similarly, in *Boatmen's Bank of Butler v. Berwald*, 752 S.W.2d 829 (Mo.App.1988), this Court reversed a jury verdict awarding $50,000 actual and $100,000 punitive damages on a borrower's counterclaim for prima facie tort. In doing so, the Court noted that since 1980, Missouri courts had "significantly limited" the availability of prima facie tort remedies. *Id.* at 833.[6] Among other things, the courts had made it clear that "a valid business reason" for defendant's conduct would defeat a prima facie tort claim.

Plaintiffs in this case were admittedly in default. Defendants were entitled to repossess all of their collateral, and their action in doing so did not offend social concepts of fairness and morality. The record was devoid of any plausible basis for a recovery under a prima facie tort, and the trial court properly so held as a matter of law.

For the aforesaid reasons, the judgment of the trial court is affirmed.

All concur.

**5.** Under § 9–114(1), a person who delivers goods under consignment has priority over the consignee's secured creditor only if (a) the consignor complies with the statutory filing provisions before the consignee receives possession; (b) the consignor gives written notice to the secured creditor; (c) the secured creditor receives the notice within five years before the consignee receives possession; and (d) the notice states that the consignor expects to deliver goods on consignment to the consignee, describing the goods by item or type.

**6.** The Missouri Court of Appeals has articulated the same point in even stronger language, noting in *Shaughnessy v. Mark Twain State Bank*, 715 S.W.2d 944, 948 (Mo.App.1986), that "[r]ecent decisions have left doubt as to the viability of the prima facie tort theory" (quoting *Costello v. Shelter Mutual Ins. Co.*, 697 S.W.2d 236, 237 (Mo.App.1985)).