[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1108 
Kenneth R. Weaver appeals from a summary judgment entered in favor of Dan Jones Ford, Inc., Ford Motor Company, and McFall Welding Company, Inc., in his action alleging violation of the Magnuson-Moss Warranty-Federal Trade Commission Improvement Act, breach of contract, breach of express and implied warranties, negligence, and fraud.
On September 16, 1993, Weaver purchased a modified F450 Ford truck from Dan Jones Ford (formerly known as Anderson Ford) in Florence, Alabama. Weaver paid $5,100 down and financed the remaining $27,949 through Ford Motor Credit Company. The truck was sold with a Ford Motor Company extended service plan, which provided coverage up to 24 months or 100,000 miles. Because Weaver intended to lease the truck as an independent hauler, with himself as a driver, he requested that Dan Jones Ford make certain modifications to the truck. These modifications included extending the truck's frame to accommodate a sleeper unit and adding a "fifth wheel" to allow the truck to tow a trailer. Before the truck was delivered to Weaver, Dan Jones Ford hired McFall Welding Company (McFall) to perform the modifications. Weaver was not aware that Dan Jones Ford had hired McFall to perform the modifications until June 23, 1994.
Weaver took delivery of the truck on September 16, 1993, in Lonoke, Arkansas, where the sleeper unit had been installed, and began driving to his home in Chester, South Carolina. During the trip, the truck developed a vibration and began to make a loud noise. When Weaver arrived in Chester, he drove the truck to the Fort Mill Ford dealership for repairs. A Ford Motor Company engineer examined the truck and determined that the driveshaft was not properly aligned and that the problem had been caused by the extension to the frame of the truck. Fort Mill Ford repaired the truck and informed Weaver that Ford Motor Company would not cover the repair under the warranty because the problem was caused by the modifications to the vehicle. Weaver then contacted Ted Kavich, vice president and general manager of Dan Jones Ford, who arranged to pay for the repairs. On November 2, 1993, Dan Jones Ford paid Fort Mill Ford $1,080.58 for the repairs to Weaver's truck.
As a result of the driveshaft problem, Weaver's truck was out of service for three weeks. During this time, Weaver and Dan Jones, the owner of Dan Jones Ford, had a series of telephone conversations regarding the problems with the truck and compensation for Weaver's loss of income during the time his vehicle was out of service. On October 1, 1993, Dan Jones Ford sent Weaver a check for $2000 as an advance on any compensation later agreed upon. Thereafter, Dan Jones told Weaver that he would pay an additional $2,500 to Weaver if he would sign a release. The $4,500 total was equal to the amount that Weaver would have earned as an independent hauler during the time his truck was being repaired. On October 8, 1993, Weaver accepted Dan Jones's offer and signed a "Full and Final Release," which provided:
 "FOR AND IN CONSIDERATION of the payment of the sum of FOUR THOUSAND FIVE HUNDRED AND NO/100 ($4,500.00), the receipt thereof is hereby acknowledged, I, the undersigned KENNETH R. WEAVER do hereby for myself or anyone claiming through or under me, my heirs, administrators, executors, or assigns, agree to release and hold harmless Anderson Ford, Inc., and/or any of said Releasee's heirs, executors, administrators, successors, assigns, agents, servants, employees, liability insurance carriers, and any and all other persons, firms and/or corporations whomsoever, from any and all liability now accrued or hereafter to accrue on account of any and all claims or causes of action, including, but not limited to, claims or causes of action for injuries and/or damages suffered by me, which I, the undersigned, for myself or anyone claiming through or under me, my heirs, executors, administrators, successors, agents, servants, employees, liability insurance carrier, and any and all other persons, firms, and/or corporations whomsoever in anyway arising from or out of the sale of that certain Ford Truck, bearing *Page 1110 
V.I.N. No. 2FDLF47C1PCB44514. Additionally, this release specifically covers any and all damages which I have suffered as a result of this vehicle being out of service shortly after delivery on September 16, 1993, until October 6, 1993.
 "It is recognized and agreed that this agreement is merely a compromise of any claim that I might have and is not and shall not be considered or construed as an admission by Anderson Ford, Inc., of any liability to anyone arising from or out of the facts and circumstances of the sale of the above-referenced vehicle or its subsequent failure to perform."
After the driveshaft problem was repaired and Weaver had signed the release, the truck continued to malfunction. In January 1994, the truck broke down in Charlotte, North Carolina, and the Tar Heel Ford dealership there attempted to repair a re-occurring oil leak, the fuel pump, the rear axle, the heater, the idler and tension pulleys, and the door locks. The truck was out of service for a week. In May 1994, the truck broke down in Columbus, Ohio, and the Bob Keim Ford dealership there attempted to repair a problem with the belts, the water pump, the starter, the heater, and the battery. Weaver paid a $50 deductible for the repairs performed by Bob Keim Ford, as required by the extended service plan. The day after the truck was repaired at Bob Keim Ford, the belt problem re-occurred in Wadsworth, Ohio. The Wadsworth Ford dealership attempted to correct the problem by rebuilding the front half of the engine. The truck was out of service for "about a week." In June 1994, the turbocharger malfunctioned in Jacksonville, Florida. The Duvall Ford dealership there replaced the turbocharger.
Except for the $50 deductible paid to Bob Keim Ford, either Ford Motor Company or Dan Jones Ford had paid for all the previous repairs to Weaver's truck. However, Duvall Ford told Weaver that the repairs it had made were not covered by the warranty. Weaver refused to pay for the repairs and left the truck at Duvall Ford.
On July 19, 1994, Weaver sued Dan Jones Ford, Inc., Ford Motor Company, and McFall Welding, Inc., in the Lauderdale County Circuit Court. The complaint alleged breach of contract, breach of express and implied warranties, negligence, fraud, and violation of the Magnuson-Moss Warranty-Federal Trade Commission Improvement Act (15 U.S.C. § 2301-2312).
Each defendant filed a separate motion for summary judgment based on the release Weaver had signed. Weaver opposed the defendants' motions, arguing that the release was invalid. Following a hearing on September 9, 1995, the trial court, without stating its reasons, granted each defendant's motion for summary judgment. Weaver appealed. The Supreme Court transferred the appeal to this court pursuant to § 12-2-7, Ala. Code 1975.
On appeal, Weaver argues that the summary judgments entered in favor of Dan Jones Ford, Inc., Ford Motor Company, and McFall Welding Company, Inc., were improper because, he says, (1) the release was invalid and (2) the release did not extend to Ford Motor Company and McFall Welding, Inc.
An appellate court reviewing a summary judgment employs the same standard utilized by the trial court. Southern GuarantyIns. Co. v. First Alabama Bank, 540 So.2d 732 (Ala. 1989). A summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c)(3), Ala.R.Civ.P. Like the trial court, the appellate court views the evidence and resolves all reasonable doubts in favor of the nonmovant. Specialty Container Mfg., Inc. v. Rusken Packaging,Inc., 572 So.2d 403 (Ala. 1990). The burden is on the movant to show that there exists no genuine issue of material fact; however, once a party moving for a summary judgment makes a prima facie showing that no genuine issue of material fact exists, then the burden shifts to the nonmovant to rebut the prima facie showing. McClendon v. Mountain Top Indoor FleaMarket, Inc., 601 So.2d 957 (Ala. 1992).
After the movant has made a prima facie showing that he is entitled to a judgment *Page 1111 
as a matter of law, the opposing party must show bysubstantial evidence that there is a genuine issue of material fact that would require a resolution by a factfinder. Johnsonv. Citizens Bank, 582 So.2d 576 (Ala.Civ.App. 1991). Substantial evidence is "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. of Florida,547 So.2d 870, 871 (Ala. 1989).
 I. Validity of the Release
Weaver contends that the summary judgments entered for the defendants could not properly be based on the release because, he says, genuine issues of material fact remained as to the validity of that release. In opposition to the defendants' motions for summary judgment, Weaver presented his own affidavit, which stated in part:
 "During the three weeks that the truck was being repaired at Ft. Mill Ford, I spoke by telephone with Mr. Dan Jones about the problems with the truck and, also, about the compensation for my downtime. Mr. Jones said he would pay me $4,500 as compensation for my downtime if I would sign a release releasing Dan Jones Ford, Inc., from any damages that I had suffered during the time the truck was being repaired.
". . . .
 "The release was faxed to me at Ft. Mill Ford. Prior to signing the release, Dan Jones represented to me that the release which I subsequently signed was limited to releasing Dan Jones Ford, Inc., only from the damages which I suffered from September 16, 1993 through October 6, 1993, as a result of the vehicle being out of service due to the driveshaft. In reliance on Mr. Jones' representations that the release was limited to only that period of time, I signed the faxed copy of the release. I did not read the release before signing it because I believed Mr. Jones' representations that the release was limited to the period September 16 through October 6, 1993."
Additionally, the record contains Weaver's deposition testimony, which includes the following:
 "Q. Why do you say [that the release] was falsely represented to you?
 "A. Because Mr. Jones had told me this release was to release him from any further problems with the driveshaft, and that only during this particular time shown on the release.
 "Q. Did you read this release before you signed it?
"A. I read over it, yes, ma'am.
 "Q. Well, do you now contend that you didn't understand it or that you didn't read it?
 "A. Well, ma'am, evidently I didn't understand it because y'all received a different wording of it than I did. Of course, that was prior — or this was after Mr. Jones' telling me what the release consisted of.
 "Q. Well, you say you received a different wording of it. What do you mean by that?
 "A. I mean, y'all interpret it different than I would.
". . . .
 "Q. You're just saying what we say it says and what you say it says are different?
 "A. I'm going by what Mr. Jones had told me the release consisted of, yes, ma'am.
 "Q. How long, between the time you talked to Mr. Jones, was it before you signed the release?
 "A. Maybe two days; the next day, two days. I can't remember exactly."
Although Weaver's affidavit and deposition testimony are somewhat inconsistent, it is clear that Weaver insists that Dan Jones told him that the release concerned compensation only for the time the truck was down, i.e., September 16, 1993 through October 6, 1993. With regard to his conversations with Weaver and the content of the release, Dan Jones testified, by deposition, as follows:
 "Q. . . . [L]et me call your attention to the dates in that sentence [of the release]; September 16th of '93 and October 6th *Page 1112 
of '93. What was the purpose of including those particular dates in the release?
 "A. The purpose of including those dates was simply to stipulate that this compensation for his downtime originated as a result of his vehicle being out of service between those dates.
". . . .
 "Q. Well, did you mention any — did you say to him, in substance, that this release covers the dates September 16th through October 6th of '93 and any other dates for which your vehicle may have been down, either now or in the future? Did you say anything to him like that?
". . . .
 "A. I don't recall specifically that anything like "that was mentioned, no."
Our Supreme Court has stated that:
 "A release induced by fraud is void. Taylor v. Dorough, 547 So.2d 536 (Ala. 1989). Fraud has four elements: (1) misrepresentation of a material fact; (2) made willfully to deceive or recklessly without knowledge; (3) which was justifiably relied upon by the plaintiff under the circumstances; and (4) which caused damage to the plaintiff as a proximate consequence. Ramsay Health Care, Inc. v. Follmer, 560 So.2d 746, 749 (Ala. 1990) (citing Bowman v. McElrath Poultry Co., 468 So.2d 879, 880
(Ala. 1985)), quoted in Harris v. M S Toyota, Inc., 575 So.2d 74, 76 (Ala. 1991)."
Hall v. Gaines, 613 So.2d 370, 372 (Ala. 1993).
In Hickox v. Stover, 551 So.2d 259, 263 (Ala. 1989), our Supreme Court developed the "justifiable reliance" standard as a replacement for the "reasonable reliance" standard used prior to Hickox.
"Under the justifiable reliance standard:
 " ' "A plaintiff, given the particular facts of his knowledge, understanding, and present ability to fully comprehend the nature of the subject transaction and its ramifications, has not justifiably relied on the defendant's representation if that representation is 'one so patently and obviously false that he must have closed his eyes to avoid the discovery of the truth.' " '
 Id. (quoting Southern States Ford, Inc. v. Proctor, 541 So.2d 1081, 1091-92 (Ala. 1989) (Hornsby, C.J., concurring specially))."
Hall, 613 So.2d at 372.
Based on Weaver's affidavit and the deposition testimony, we find that genuine issues of material fact remain concerning the validity of the release. Dan Jones conceded that the effect of the release, as written, is considerably more comprehensive than he explained to Weaver. Thus, there was substantial evidence which could allow a jury to find that Dan Jones made a misrepresentation of material fact. Further, we find that a jury question remains as to whether Weaver's reliance on Dan Jones's representations regarding the contents of the release was justifiable within the meaning of the law. Although the release is clear on its face to a person with a legal education, the language in the release may not be clear to a layperson. In particular, the critical language "from any and all liability now accrued or hereafter to accrue" may be confusing or unintelligible to a layperson. Further, that sentence in the release which states "Additionally, this release specifically covers any and all damages which I have suffered as a result of this vehicle being out of service shortly after delivery on September 16, 1993, until October 6, 1993" is misleading because the release, on its face, precludes recovery from any damages "now accrued or hereafter to accrue." In light of the language used in the release, we cannot find that Dan Jones's representations were "so patently and obviously false that [Weaver] must have closed his eyes to avoid the discovery of the truth." Hall, 613 So.2d at 372.
Viewing the evidence in the light most favorable to the nonmovant, Weaver, we hold that the defendants' summary judgments could not properly be based on the release, because genuine issues of material fact remain as to the validity of the release.
 II. Merits of the Claims
Although we hold that the summary judgments could not be properly based on the release, when a trial court does not specify the grounds upon which it based its summary *Page 1113 
judgment, an appellate court is bound to affirm the judgment if there is a valid basis for it. Hughes v. Allenstein,514 So.2d 858 (Ala. 1987). Accordingly, we must review the merits of Weaver's claims against each defendant based on the information contained in the record to determine if a valid basis for the summary judgments exists.
 A. Count One
Count one of Weaver's complaint alleged that Dan Jones Ford and Ford Motor Company violated the Magnuson-Moss Warranty-Federal Trade Commission Improvement Act, 15 U.S.C. § 2301-2312, because, Weaver says, the truck was defective and not fit for ordinary and particular uses. However, that Act applies only to "consumer goods". See 15 U.S.C. § 2301-2312;Richards v. General Motors Corp., 461 So.2d 825
(Ala.Civ.App. 1984).
 "State law, not the [Magnuson-Moss] Act, determines whether [a vehicle] is a consumer good or equipment. The test adopted in Alabama is the 'primary use' test. If the goods 'are used or bought for use primarily for personal, family or household purposes,' they are consumer goods. § 7-9-109(1), Code 1975. If they 'are used or bought for use primarily in business,' they are equipment. § 7-9-109(2), Code 1975. The primary use of the good or equipment is a matter of fact to be determined by a jury. See Grimes v. Massey Ferguson, Inc., 355 So.2d 338 (Ala. 1978)."
Richards, 461 So.2d at 826. Accordingly, we hold that the summary judgments in favor of Dan Jones Ford and Ford Motor Company, as they related to Weaver's claims alleging violations of the Magnuson-Moss Act, could not properly be based on the proposition that the truck was not a "consumer good."
 B. Count Two
Count two of Weaver's complaint alleged that Ford Motor Company had breached the extended service plan that Weaver purchased when he bought the truck. Ford Motor Company contends that this claim is barred because, it says, the clear language in the extended service plan states that the plan does not cover "failures caused by modifications or parts not authorized or supplied by Ford [Motor Company]." Although this language may limit Ford Motor Company's liability for some of the loss Weaver incurred, the record does not contain sufficient information to allow the trial court or this court to specifically determine Ford Motor Company's liability. Consequently, questions of fact exist and a jury must determine if the truck's malfunctions were the result of the modifications to the truck. Thus, the summary judgment in favor of Ford Motor Company, as it relates to this warranty claim, cannot properly be based on the proposition that the claim was barred by the language Ford Motor Company relies on.
 C. Counts Three, Four, Five, and Six
Counts three through six alleged that Dan Jones Ford and Ford Motor Company had breached the implied warranties set out in Article 2 of Alabama's Uniform Commercial Code. However, the implied warranties set forth in the Uniform Commercial Code place obligations on the seller of goods. In this case, Ford Motor Company was the manufacturer of the truck, and Jones was the seller. § 7-2-103(1)(d). In Rhodes v. General Motors Corp.,621 So.2d 945 (Ala. 1993), our Supreme Court stated that "without privity of contract, there is no right of action against a manufacturer for direct economic loss." 621 So.2d at 947. Because there is no privity of contract between Weaver and Ford Motor Company, the summary judgment for Ford Motor Company is affirmed as it relates to the breach of implied warranties.
As the seller of the truck, Dan Jones Ford may be held liable for breach of the implied warranties. The record contains no evidence that would preclude Weaver from recovering for Dan Jones Ford's breach of implied warranties. Therefore, the summary judgment for Dan Jones Ford was improper as to counts three, four, five, and six.
 D. Counts Seven and Eight
Count seven alleged that Ford Motor Company had negligently manufactured, *Page 1114 
designed, and distributed, or had negligently sold, the truck. Count eight alleged that McFall Welding had negligently designed, extended, and assembled the frame or component parts of the truck. It has been widely recognized that one cannot recover in tort for injury to the product itself; compensation for such injury may be obtained through the available contractual remedies. Dairyland Insurance Co. v. General MotorsCorp., 549 So.2d 44 (Ala. 1989); see also Lloyd Wood Coal Co. v.Clark Equip. Co., 543 So.2d 671 (Ala. 1989). Consequently, the summary judgments for Ford Motor Company and McFall Welding are affirmed as to counts seven and eight.
 E. Count Nine
Count nine alleged that Dan Jones Ford and Ford Motor Company had breached express warranties of merchantability and fitness for a particular purpose. Ford Motor Company contends that it was entitled to a summary judgment on this claim because its express warranty included a provision stating: "Ford [Motor Company] may deny you warranty coverage if your vehicle or a part has failed due to abuse, neglect, improper maintenance, or unapproved modifications." While some of the problems with Weaver's truck occurred "due to . . . unapproved modifications," the record does not contain enough information to determine the cause of each problem or the extent of the loss Weaver suffered as a result of each problem. Because genuine issues of material fact remain in this regard, the summary judgments were improper as they relate to count nine.
 F. Count Ten
Count ten alleged that Dan Jones Ford had fraudulently misrepresented the contents of the extended service plan that Weaver purchased when he acquired the truck. The record does not contain any information that would negate this allegation as a matter of law. Accordingly, the summary judgment for Dan Jones Ford was improper as to count ten.
 Conclusion
The summary judgment for Dan Jones Ford is reversed. The summary judgment for Ford Motor Company is reversed as to counts one, two, and nine; it is otherwise affirmed. The summary judgment for McFall Welding is affirmed.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
MONROE, J., concurs.
THIGPEN, J., concurs in the result.