CHRYSLER FINANCIAL COMPANY, L.L.C., Plaintiff–Counterclaim Defendant–Appellant,

v.

William E. FLYNN, Jr., Defendant–Counterclaimant–Respondent,

and

Grace A. Flynn, Counterclaimant–Respondent.

No. 24546.

Missouri Court of Appeals, Southern District, Division Two.

Sept. 26, 2002.

Petition for Rehearing and Transfer Denied Oct. 17, 2002.

Application for Transfer Denied Nov. 26, 2002.

---

Nelson L. Mitten and Norbert Glassl, Riezman Berger, P.C., St. Louis, MO, for appellant.

Grant Q. Haden and Randy R. Cowherd, Haden, Cowherd, Bullock & McGinnis, L.L.C., St. Louis, MO, for respondents.

JAMES K. PREWITT, Presiding Judge.

Chrysler Financial Company, L.L.C. ("CFC") appeals from a judgment entered in accordance with verdicts reached following jury trial in favor of William E. Flynn, Jr. ("Bill") on CFC's petition for replevin and Bill's counterclaim counts for trespass, conversion, and breach of contract, and in favor of Bill's wife, Grace A. Flynn ("Grace"), on her counterclaim count for negligent infliction of emotional distress. In addition to compensatory damages on the counterclaims, the jury awarded punitive damages on the trespass claim. CFC raises eleven points of alleged error.[1]

The Flynns relocated from Massachusetts to a farm in Wright County, Missouri in August, 1997. They moved primarily because of vandalism and verbal abuse they encountered from surrounding residents who were displeased that the Flynns' Massachusetts livestock and farming operations were in close proximity to a residential development.

On the Missouri farm, Grace raised various animals, although it was mostly to occupy her time and that of the children,

---

1. Throughout this opinion, for simplicity sake, we will refer to the Flynns by their first names. We mean no disrespect.

because she and Bill did not make any profit from their farming activities. Bill worked as an over-the-road truck driver, and would sometimes be gone for five or six weeks at a time. The Flynns had an older Ford one-ton truck with a dump body that Grace used when taking care of the animals. They also had an older Dodge vehicle with 186,000 miles.

They decided to purchase a new truck with a dump body that would serve the farm-related purposes of the Ford truck, as well as be their "new car, dependable transportation" to use to go shopping, run errands, attend 4–H and church activities, or transport children to and from school. Grace estimated that the new truck was used ninety percent for family transportation and ten percent for the dump body.

During a trip back to Massachusetts, Bill found a suitable truck at Donahue Dealership ("the dealer") and final arrangements to purchase the truck were made after Bill returned to Missouri. Before going back to Massachusetts to retrieve the truck, Bill obtained 12,000 pound gross limit farm license tags, which he understood would allow the use of the truck for household and family purposes. The truck purchased was a 1997 one-ton Dodge with 4–wheel drive, a dump body, and a trailer hitch.

Bill completed a credit application for the purchase of the truck, on which his occupation was listed as farmer. On the subsequent retail installment contract, the use of the truck was designated as agricultural; neither the personal or business categories were checked. According to Bill, the sales manager at the dealer marked that box while Bill was not in the room.

The contract, which the dealer assigned to CFC, included the following provisions. [Section] G. **Remedies Upon Default.** . . . . Creditor has the right to take pos-session of the Vehicle. Creditor may, without the use of force or other breach of the peace, with the consent of Buyer given at the time of entry, enter the premises where the Vehicle may be and take immediate possession of the Vehicle including any equipment or accessories. If the premises where the Vehicle may be is owned or rented by or to you, Creditor may not enter such premises to take possession without your contemporaneous consent.

. . . .

[Section] H. **Assignment.** You acknowledge that this contract will be assigned to [CFC] ("Assignee"). You further acknowledge that Assignee will acquire all of Creditor's interest in this contract and in the Vehicle and will be entitled to all of the rights and remedies granted to Creditor pursuant to the terms and conditions of this contract including, but not limited to, the right to receive all payments and to require the performance of all obligations required by this contract.

. . . .

[Section] K. **Governing Law.** This contract shall be governed by the laws of the State of Massachusetts except, if the Vehicle is repossessed, then the law of the state where the Vehicle is repossessed will govern the repossession. Repossession effected through legal process will be governed by the laws of the state in which such process is brought.

. . . .

**WARRANTIES WE DISCLAIM. You agree that you are buying the Vehicle "AS IS" and that there are no implied warranties of merchantability, fitness for a particular purpose, or other warranties, express or implied, covering the vehicle unless: 1. the vehicle is of a type normally used for personal, family or household purposes, and 2.**

the vehicle was manufactured after July 3, 1975, and 3. we have given you our written warranty or service contract covering the vehicle on the date of this contract covering the vehicle on the date of this contract or within 90 days after such date.

. . . .

**NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.**

**The preceding NOTICE applies to goods and services obtained primarily for personal, family or household use.**

When Bill retrieved the vehicle, the dealer presented him with a warranty booklet, which included information on warranties provided by Chrysler Corporation (as distinguished from Chrysler Finance Corporation or CFC, the party to these proceedings). Among the warranties provided was a basic coverage warranty for three years or 36,000 miles. Under the basic warranty, Chrysler Corporation agreed to cover

the cost of all parts and labor needed to repair any defective item on your truck—that is, defective in material, workmanship, or factory preparation. There is no list of covered parts since the only exception is tires. You pay nothing for these repairs. These warranty repairs, or adjustments—including all parts and labor connected with them—will be made by your dealer at no charge, using new or remanufactured parts.

The warranty booklet provided by the dealer also included a section on the buyer's legal rights under the warranties, which included the following information.

The warranties contained in this booklet are the only express warranties that Chrysler [Corporation] makes for your truck. These warranties give you specific legal rights.

You may also have other rights that vary from state to state. For example, you may have some implied warranties, depending on the state where your truck is registered:

- An "implied warranty of merchantability" means that your truck is reasonably fit for the general purpose for which it was sold.

- An "implied warranty of fitness for a particular purpose" means that your truck is suitable for your special purposes if those special purposes were specifically disclosed to Chrysler [Corporation] itself—not merely to the dealer—before your purchase.

These implied warranties are limited, to the extent allowed by law, to the time periods covered by the express written warranties contained in this booklet.

If you use your truck primarily for business or commercial purposes, then these implied warranties do not apply and Chrysler [Corporation] completely disclaims them to the extent allowed by law.

In January, 1998, an incident occurred in which the truck was damaged. While Grace was emptying the truck, she heard a loud noise, at which time she stopped dumping the contents of the truck. Further investigation showed that the tailgate had "bound up against the hitch[,]" causing damage to the subframe, tailgate, and tailgate mechanism, and bending the frame of the truck. According to Grace, she had

been operating the dump mechanism with the tailgate down after having removed the top pins. Bill testified that if the trailer hitch had been installed an inch higher, the incident would not have occurred.

Bill contacted the dealer, but they refused to repair the vehicle. Bill then took the truck to Morse Manufacturing ("Morse"), the company that had installed the dump body for the dealer, for repair. Morse repaired the vehicle so that it was useable, but did not repair it completely. Neither the dealer nor Morse were willing to cover the cost of the repairs and associated expenses, which Bill calculated at $12,375.

Between April, 1998, and April, 2000, Bill contacted both Chrysler Corporation and CFC on several occasions. He sought reimbursement for expenses related to the repairs, which he indicated he would accept as a credit to his account with CFC, as well as either complete correction of what he termed a defect in the vehicle or replacement of the vehicle.

Chrysler Corporation sent a letter denying any warranty claim. CFC informed Bill that his only recourse was through the dealer or Chrysler Corporation, because CFC was only the holder of the note and, therefore, was not responsible for any warranty claim on the vehicle. CFC considered itself separate from Chrysler Corporation and the Chrysler dealer from which Bill purchased the vehicle. CFC also advised Bill to continue making payments; otherwise his credit would be affected. Bill's last payment to CFC was in April, 2000.

Also in April, 2000, Bill wrote a letter to the sheriff of Wright County, informing him that CFC had threatened to repossess the vehicle and that the contract prohibited CFC from entering his property without permission. Grace understood that if the vehicle were repossessed, the person repossessing the vehicle would present paperwork to her and/or Bill before taking away the truck. She also assumed that any repossession would occur only with the sheriff present.

On June 7, 2000, CFC issued its order for repossession. Within a week, a recovery agent hired by CFC attempted to repossess the truck. Pursuant to company policy, the repossession took place early in the morning, around 4:30 or 5:00 a.m. Grace, whose dogs alerted her to the activity, saw the truck and one other vehicle just as they were being driven off the property. She was scared, and went to find the sheriff's number because she determined it was too late for her or her son to chase the vehicles with an ATV, which was the Flynn's only other vehicle. The Flynn property was posted with no trespassing signs.

As the recovery agent pulled out of the driveway, he called the sheriff's department to inform them of the repossession. When Grace called the sheriff's department, she was hysterical and upset, concerned that the truck had been stolen, and the dispatcher informed her that the vehicle had been repossessed. Later that morning, following a series of communications between Grace, Bill, and the sheriff, the sheriff drove to the Flynn's property to look at the contract.

The sheriff then contacted both the prosecuting attorney and the recovery agent because he felt that the actions constituted car theft and trespass, rather than a legal repossession. The prosecuting attorney agreed, and discussions ensued between the sheriff, the recovery agent, and CFC, which led to the return of the vehicle to the Flynns' later that evening. Bill estimated that the value of the truck was reduced by $1,000 during the course of the attempted repossession.

Upon the vehicle's return, Grace parked it in the barn with the backhoe in front of it to prevent any "thieves" from taking the truck again. Her fear that someone would return to the property and steal the vehicle or other items led her to put locks on both of the gates to the property.

On June 22, 2000, CFC filed a replevin action against Bill. On July 7, 2000, the Flynns filed an answer and a counterclaim, which included counts for trespass, conversion, breach of contract, and negligent infliction of emotional distress. The Flynns also requested punitive damages, but at trial, limited them to the trespass claim.

On July 10, 2000, Bill took Grace to Dr. Thomas Blansett, a licensed psychologist, to help her deal with the incident and its effect on her. Dr. Blansett initially diagnosed Grace with acute anxiety disorder. On a subsequent visit, Dr. Blansett determined that Grace was still experiencing difficulty, but that the stress and symptoms were somewhat reduced; he ultimately diagnosed her with an adjustment disorder with anxiety, but deemed it a chronic disorder. Dr. Blansett indicated that Grace exhibited fear and hypervigilance, felt very vulnerable, and experienced strong anxiety-related symptoms at the mention of the word "Chrysler." According to Bill, the changes in Grace's behavior and emotional state since the incident still existed at the time of trial. Bill paid $300 in out-of-pocket expenses for Grace's care.

Following jury trial, verdicts were returned in favor of Bill on CFC's replevin claim, as well as Bill's counterclaim counts of trespass, conversion, and breach of contract. The jury awarded Bill actual damages of $200 on the trespass claim, $50,000 on the conversion claim, and $12,500 on the breach of contract claim. The jury also awarded $250,000 in punitive damages on the trespass claim. On the negligent inflic-

tion of emotional distress claim, the jury returned a verdict in favor of Grace and awarded her actual damages of $5,000. The trial court denied CFC's motion for judgment not withstanding the verdict ("JNOV") or, in the alternative, motion for new trial or for remittitur.

CFC raises eleven points on appeal. We start by addressing aspects of Points VI and VII related to the breach of contract counterclaim. Allegations made as part of the breach of contract claim included that the manner in which the dump body was installed in conjunction with the trailer hitch was defective; the defective design caused damage to the vehicle; the retail installment contract assigned by the dealer to CFC provided that "any holder of this consumer contract is subject to all claims and defenses which [Bill] could assert against the seller of the goods or services obtained pursuant hereto or with the proceeds hereof"; CFC, as assignee, was placed on notice of the warranty claims made by Bill; CFC failed to credit Bill's account; CFC breached the warranty agreement; and CFC breached the assignment portion of the contract.

Within Point VI, as it relates to the breach of contract counterclaim, CFC argues that the trial court erred in denying CFC's motion for JNOV or for new trial because CFC had an immediate right to take possession of the vehicle, Bill failed to provide notice of any claims against the dealer, and the Flynns failed to introduce substantial evidence that Bill had a superior right to possession due to claims against the dealer.

The focus of CFC's argument is that there was not sufficient evidence presented under which the jury could have determined that the vehicle was used for personal, household, or family reasons, which would allow its classification as a

consumer good. According to CFC, whether the vehicle could be classified as a consumer good would affect whether the warranty disclaimers contained in the contract were valid and whether CFC's alleged holder-in-due course status protected it from any derivative warranty liability.

Within the portion of Point VII that relates to the breach of contract counterclaim, CFC argues that the trial court erred in denying its motion for new trial because the trial court ruled, as a matter of law, that the vehicle "was sold as a personal, family or household use vehicle." In addition to the effect on CFC's liability on the warranty claim brought as part of the breach of contract claim, which are noted above, CFC argues that the issue of whether the vehicle was sold as a personal, family, or household vehicle (and therefore a consumer good) was an issue for the jury to determine.

■ In reviewing the trial court's denial of a motion for JNOV, an appellate court must determine whether the non-moving party made a submissible case. *Ralph v. Lewis Bros. Bakeries,* 979 S.W.2d 509, 514 (Mo.App.1998). To make a submissible case, substantial evidence is required for every fact essential to liability. *Steward v. Goetz,* 945 S.W.2d 520, 528 (Mo.App.1997). We review the evidence in the light most favorable to the non-moving party, presume the non-moving party's evidence is true, and give the non-moving party the benefit of all reasonable and favorable inferences that may be drawn from the evidence. *Id.*

■ Under § 408.405, RSMo Supp.1999, "[t]he rights of a holder or assignee of an instrument, ... which evidences the obligation of a natural person as buyer ... or borrower in connection with the purchase ... of consumer goods ..., are subject to all defenses and setoffs of the debtor aris-

ing from or out of such sale." Recall that a provision in the contract contained similar language. Although a holder in due course typically takes the instrument free of all defenses that may have existed between the prior parties to the original contract (here, the dealer and Bill), the statute was meant to limit the rights of a holder in due course and preserve the rights of purchasers of consumer goods. *Roosevelt Fed. Sav. & Loan Ass'n v. Crider,* 722 S.W.2d 325, 327 (Mo.App.1986).

The legal principle stated above also has been applied in Missouri cases where there is a question of whether warranty disclaimers are effective or whether action is allowed under the federal Magnuson–Moss Warranty Act (MMWA). *See e.g., Muchisky v. Frederic Roofing Co., Inc.,* 838 S.W.2d 74, 78 (Mo.App.1992). A consumer product is defined under the MMWA as "any tangible personal property which is distributed in commerce and which is normally used for personal, family, or household purposes." 15 U.S.C. § 2301(1). Under Missouri statute, a consumer good is defined as that which is "use[d] primarily for personal, family or household purposes." § 408.400.1(2), RSMo Supp.1999.

Thus, CFC is correct that the breach of contract counterclaim, and the warranty issues included within it, may be resolved by the jury if there first is a determination of whether the truck is a consumer good. Here, the trial court made that determination for the jury by ruling that the vehicle was a consumer good under Missouri law because it "was sold as a personal, family or household use vehicle."

No Missouri case has specifically addressed or commented upon the issue of whether a vehicle (or any product) meets the definition of consumer good is a question for the jury. Other states have addressed the issue.

In Alabama, in a case where the state statutory definition was similar to Missouri's, the court determined that "the primary use of the good or equipment is a matter of fact to be determined by the jury." *Weaver v. Dan Jones Ford,* 679 So.2d 1106, 1113 (Ala.Civ.App.1996). In Texas, in a case that involved the interpretation of the state statutory definition of consumer goods, equipment, farm products, or inventory, the court determined "that the status or quality of . . . vehicles . . . is a material issue of fact." *Citizens Nat'l Bank of Temple v. Baggerly,* 649 S.W.2d 812, 813–14 (Tex.App.1983). In an Oregon case involving the definition of consumer product under the MMWA, the court did not address the issue directly, but did note that the facts in the case were "not sufficient to allow the jury to find that [the vehicle] was a consumer product as defined in the [MMWA]." *Crume v. Ford Motor Co.,* 60 Or.App. 224, 653 P.2d 564, 567 (1982).

■ We find that the determination of whether a vehicle is a consumer good is a fact intensive issue; such issues are best reserved for resolution by the jury. *See Rosenfeld v. Thoele,* 28 S.W.3d 446, 450 (Mo.App.2000). The judgment related to the breach of contract counterclaim is reversed and the cause remanded for a new trial on all issues related to that count. Before determining any liability or damages on the breach of contract count based on theories involving warranties, the jury must determine whether the vehicle is a consumer good under Missouri law or, if the claim is tried under a MMWA theory, whether the vehicle is a consumer product under the MMWA. *See Drew v. Chrysler Credit Corp.,* 596 F.Supp. 1371, 1374 (W.D.Mo.1984).

This point is dispositive; however, we will address CFC's remaining points on appeal to the extent that the issues may be raised on retrial. In Point I, CFC contends that the trial court erred in denying its motion for JNOV or for new trial on the counterclaim counts of trespass, conversion, negligent infliction of emotional distress, and punitive damages. CFC argues that the basis for the trial court's error is that Missouri law sanctions self-help repossession and precludes imposition of tort liability for breach of contract obligations. CFC contends that all of the tort claims are precluded because they are based on CFC's alleged breach of contract.

■ CFC is correct that Missouri law permits self-help repossession, including entry on a debtor's property without prior consent, so long as the creditor does not breach the peace. § 400.9–503, RSMo Supp.1999; *see also Sperry v. ITT Commercial Fin. Corp.,* 799 S.W.2d 871, 879 (Mo.App.1990). The creditor's duty to repossess property without breaching the peace is imposed by UCC, as adopted by Missouri statute, and is intended to protect debtors and others that might be affected by activities associated with repossession. *Browning by Browning v. White,* 940 S.W.2d 914, 924 (Mo.App.1997). In the absence of any confrontation with the debtor or damage to property at issue or debtor's property, a creditor has not breached the peace. *Sperry,* 799 S.W.2d at 879.

Here, there was one contractual provision that required, upon default, the creditor obtain consent of debtor at the time of entry and not breach the peace. The provision further specified that, if the debtor owns the premises on which the property may be found, the creditor may not enter the premises to repossess the property without the debtor's contemporaneous consent. A second contract provision stipulated that if the vehicle was repossessed, the laws of the state in which the repossession occurred would govern.

The first two sentences of § 400.9–503, RSMo Supp.1999, read as follows:

> Unless otherwise agreed a secured party has on default the right to take possession of the collateral. In taking possession a secured party may proceed without judicial process if this can be done without breach of the peace or may proceed by action.

That statutory language reflects the requirements of the latter contractual provision, since it recites Missouri law covering repossession, and Missouri is the state in which the attempted repossession took place.

The Flynns argue that the first contractual provision could be interpreted to require something additional or different than the second contractual provision, which requires that any repossession be conducted according to, in this case, Missouri law. They contend that there is an apparent inconsistency or conflict between the two provisions in the contract, which makes the contract susceptible to two interpretations and, therefore, ambiguous. *See A & L Holding Co. v. Southern Pacific Bank*, 34 S.W.3d 415, 418 (Mo.App.2000). They point us to a principle of contract construction under which language that deals with a more specific situation prevails over language in the more general provision, if there is ambiguity or inconsistency between them. *Id.* at 419. The more specific provision or language operates to modify and, to such an extent, nullifies the more general. *Id.*

■ The Flynns' arguments are not without merit; however, their merit is more applicable to the analysis of a breach of contract claim based on the allegedly conflicting provisions, than to the tort-based counts in the counterclaim, which are the subject of CFC's first point. Missouri has never recognized a mere breach of contract as providing the basis for tort

liability. *Khulusi v. Southwestern Bell Yellow Pages, Inc.*, 916 S.W.2d 227, 230 (Mo.App.1995). It is the act itself that serves as the basis of any tort liability, not the breach. *Id.* If the act, independent of the contract, would result in tort liability, it would continue to do so even in the presence of a contract. *Id.* However, if in the absence of a contract the act would not represent a tort, the mere breach of the contract will not create tort liability. *Id.*

The Flynns argue that, in absence of the contract, there was no secured creditor/debtor relationship between CFC and Bill. Therefore, according to the Flynns, the *Khulusi* analysis would place CFC in the position of someone with no rights as a secured creditor over the property, with no right to repossess the vehicle. Thus, the Flynns contend the act, in absence of that contractual relationship, consisted of trespass, conversion, and negligent infliction of emotional distress.

The Flynns' suggested analysis may take *Khulusi* too far. The contractual provision requiring CFC to obtain consent prior to any attempted repossession is the key. The correct question to ask is whether, in the absence of that contractual provision, CFC was a secured creditor following Missouri law, which allows self-help repossession, including entry on a debtor's property without prior consent, so long as the creditor does not breach the peace. § 400.9–503, RSMo Supp.1999; *see also Sperry*, 799 S.W.2d at 879. As the right to enter is given by Missouri law, there is no tort if CFC was entitled to the repossession.

■ The contractual provision requiring consent does not modify Missouri's statute allowing lawful entry into a debtor's property upon default, so long as the creditor does not breach the peace. There is no evidence CFC breached the peace. The

contractual provision cannot change a lawful entry into a tortious entry.

CFC contends there was substantial evidence that Bill was in default, having not made a payment to CFC since April, 2000. Therefore, according to CFC, its actions through its hired recovery agent constituted a legal repossession under Missouri law, and may not serve as the basis for independent tort liability.

If Bill was in default, there was a legal repossession under Missouri law; thus, the repossession actions may not serve as a basis for independent tort liability, and that under such circumstances, the tort claims (trespass, conversion, and negligent infliction of emotional distress) must fail. However, whether it was a legal repossession under Missouri law may be dependent upon the outcome of Bill's breach of contract claim, specifically whether the jury finds on retrial that there is a valid warranty claim against CFC. *See Byrne Fund Mgmt., Inc. v. Jim Lynch Cadillac, Inc.,* 922 S.W.2d 434, 436–37 (Mo.App.1996).

■ CFC's Point II discusses the punitive damage award on the trespass counterclaim. The analysis presented with respect to Point I may affect this point as well. It is a predicate for punitive damages that actual damages are found. *Ervin v. Coleman,* 454 S.W.2d 289, 292 (Mo. App.1970), *overruled on other grounds by, Sharp v. Robberson,* 495 S.W.2d 394 (Mo. 1973). Further, without evidence of actual damages, there can be no punitive damage award. *O'Shaughnessy v. Ward Aircraft Sales & Service, Inc.,* 552 S.W.2d 730, 736 (Mo.App.1977). Therefore, if there is no basis for any of the tort counterclaim counts, the award of punitive damages on the trespass claim, which was the only

claim for which the Flynns requested punitive damages at trial, would not stand.

■ In part, Points VI and VII address CFC's contention that the trial court erred in denying its motion for JNOV or for new trial on its replevin count. If CFC had a legal right to repossess, it would have the same right to immediate possession under an action for replevin. The essence of a replevin claim is a test of a plaintiff's right to possession of the property. *Sedalia Mercantile Bank & Trust Co. v. Loges Farms, Inc.,* 740 S.W.2d 188, 198 (Mo.App.1987). CFC, as plaintiff in the replevin action, has the burden to plead and prove an immediate right to possession. *Turman v. Schneider Bailey, Inc.,* 768 S.W.2d 108, 112 (Mo.App.1988). Under § 400.9–503, RSMo Supp.1999, in the absence of a valid warranty claim against CFC, it had "on default the right to take possession of the collateral." Under *Byrne Fund Mgmt.,* the validity of any warranty claim against CFC must be determined before the validity of the replevin claim may be determined. *See Byrne Fund Mgmt.,* 922 S.W.2d at 436–37.[2]

■ We addressed a portion of Point VI initially; however, one other issue in Point VI is likely to be raised upon retrial. CFC argues that to show that a defect was present in the vehicle, which is the basis for the warranty claims made by Bill, expert testimony is required. CFC contends that Bill failed to prove any warranty was breached because the only testimony regarding any alleged breach was from Bill himself. We do not read Missouri law to require expert testimony in all cases to prove that a defect caused the damages alleged. Instead, expert testimony is required only in absence of other direct evidence as to what caused the damage. *See*

2. By requiring that the validity of the replevin claim must be determined prior to the validity

of the warranty claim, we are not advocating separate trials on those issues.

*Jones v. Trittler,* 983 S.W.2d 165, 168 (Mo. App.1998).

In Point VIII, CFC contends that the trial court erred in denying its motion for remittitur from the verdict awarding Bill $12,500 on his breach of contract counterclaim because the damages were not reduced by the outstanding balance owed by Bill under the contract. The issues of liability and damages will be before the jury on retrial, but the narrow issue of whether any resulting damages must be reduced by an outstanding balance on the contract is likely to resurface on retrial; thus, we will address it here.

Among the allegations contained within Bill's breach of contract counterclaim was that he had "been damaged in the sum of $12,375.00 in actual costs, less the outstanding balance of the note." In his prayer for relief on the breach of contract counterclaim count, Bill specifically requested "the sum of $12,375.00, less the outstanding balance of his note, and for such other and further relief as the [trial court] deems just and proper in the premises."

As stated in the jury instruction used in the first trial, of which CFC does not complain, the measure of damages in a breach of warranty case of this kind is "the difference between the fair market value of the [vehicle] before it was damaged and its fair market value after it was damaged, plus such sum as you may find from the evidence will fairly and justly compensate [Bill] for the loss of use thereof during the time reasonably necessary for the property to be repaired or replaced." *See* §§ 400.2–714 and 715, RSMo Supp.1999; MAI 4.17; *Foster v. CBS, Inc.,* 567 F.Supp. 128, 130–31 (E.D.Mo.1983).

▪ The jury may, therefore, hear and weigh evidence related to the difference between fair market value before and after damage occurred, as well as any incidental and consequential damages suffered by Bill. CFC is correct that when a jury finds liability under a breach of contract claim, the measure of damages must be reduced by any indebtedness owed on the contract. *See Slaughter v. Clarahan,* 15 S.W.2d 943, 944 (Mo.App.1929).

▪ However, the above legal principle is only applicable to the extent that the breach of contract claim is considered in absence of the other claims. Here, if CFC recovers on its replevin claim, that would affect the analysis of any resulting damages for Bill on the breach of contract claim. Missouri has a rule against double compensation for the same injury. *Meco Systems, Inc. v. Dancing Bear Entertainment, Inc.,* 42 S.W.3d 794, 811 (Mo.App. 2001).

A decision in favor of CFC on the replevin claim entitles CFC to be made whole, and a decision in favor of Bill on the breach of contract claim would entitle him to be made whole. *See Inauen Packaging Equipment Corp. v. Integrated Indus. Services, Inc.,* 970 S.W.2d 360, 368 (Mo.App. 1998). However, neither is entitled to the windfall of a double recovery. *Id.* Of course, if CFC prevailed on its replevin claim, it would be allowed to take possession of the vehicle and sell it, which would also affect any outstanding balance owed by Bill. *See Sedalia Mercantile Bank,* 740 S.W.2d at 199.

CFC's final two points, Points X and XI, address issues related to the jury instructions given on the breach of contract counterclaim. The instruction at issue, which, according to the Flynns' counsel at trial, was based on MAI 26.02, reads as follows:

> On the claim of William Flynn against [CFC] for breach of contract, your verdict must be for William Flynn if you believe:

First, the [vehicle], as sold by [the dealer], was not fit for its intended purpose in that the tailgate, when the dump body was operated, struck the trailer hitch, and

Second, [CFC] failed to honor the claims or defenses which William Flynn could have asserted against the seller, [the dealer], and

Third, because of such failure, [CFC's] contract obligations were not performed, and

Fourth, William Flynn was hereby damaged.

CFC contends that the instruction granted the jury a roving commission and that it was inappropriately based on MAI 26.02, which is the verdict director for breach of contract, where breach is the sole issue. CFC contends that the instruction should have been based on MAI 25.08, which is the verdict director for breach of implied warranty of merchantability, as modified by MAI 26.06, which is the verdict director applicable to situations where both the terms of the contract and the breach are at issue.

As the cause has been remanded for retrial on the breach of contract counterclaim count, we will only address these points to the extent necessary to discuss issues that are likely to be raised on retrial. The instruction as written did not include the submission of an issue that we established earlier is necessary for the jury's determination, assuming the case is presented to the jury based on the same theories as in the first trial. That issue is whether the vehicle is a consumer good or product.

In this case, it is quite possible that none of the proposed MAI instructions adequately cover the situation, as the contract at issue was not the type of contract to which either MAI 26.02 or 26.06 (where terms and breach of contract at issue)

usually apply. *See Crank v. Firestone*, 692 S.W.2d 397, 401 (Mo.App.1985). However, it may not be necessary to base the instruction on MAI 25.08 as CFC suggests, as cases do exist where a modification of MAI 26.02 was appropriate to submit issues related to breach of warranty claims. *Id.*

■ Rule 70.02(b) recognizes that there may not be a MAI applicable to every situation. *Stalcup v. Orthotic & Prosthetic Lab, Inc.*, 989 S.W.2d 654, 658 (Mo.App.1999). Under 70.02(b), instructions not in MAI form must be "simple, brief, impartial, free from argument, and shall not submit to the jury or require findings of detailed evidentiary facts." Our review of a non-MAI instruction, including the modification of a MAI instruction, is based on whether the jury could understand the instruction and whether it followed applicable substantive law by submitting the ultimate facts required to sustain a verdict. *Stalcup*, 989 S.W.2d at 658. Which are the ultimate facts is determined on a case-by-case basis and the determination involves analysis of the specific theory(ies) upon which the party offering the instruction relies. *Id.*

Without knowing the exact theories upon which Bill may present his breach of contract claim on retrial, we are unable to further address Points X and XI beyond the general law stated above.

The judgment is reversed and the cause remanded to the trial court with directions for it to proceed in a manner not inconsistent with this opinion.

RAHMEYER, C.J., and PARRISH, J., concur.